## PHILLIPS PETROLEUM CO. et al. v. STATE et al.

### No. 7382.

Court of Civil Appeals of Texas. Austin.
July 29, 1933.

Rehearing Denied Sept. 27, 1933.

Don Emery and Turner, Culton & Gibson, all of Amarillo, Burney Braly, of Fort Worth, Frank Willis and Sanders & Scott, all of Amarillo, R. L. Batts, of Austin, David Proctor, of Fort Worth, and Morgan, Morgan & Britain, of Amarillo, for appellants.

Robert Lee Bobbitt, Atty. Gen., W. W. Caves, Asst. Atty. Gen., C. W. Trueheart, of Longview, G. B. Smedley, of Fort Worth, and Cooper & Lumpkin, of Amarillo, for appellees.

BAUGH, Justice.

This appeal is from a judgment in favor of the state against appellants for the recovery as vacant lands of 525.2 acres in Hutchinson county, a money judgment for $916,578.27 against named oil companies for oil taken

from said lands up to September 30, 1928, and decreeing to E. B. Trigg a prior right to purchase said land from the state.

The only issue in the case is the proper location of the Mary Whitley survey. All of the surrounding surveys to which its field notes call to adjoin are senior surveys to the Whitley, and a brief history of these surveys as shown by the record, which is voluminous, will perhaps contribute to a better understanding of the issues presented, and reference at this point to the attached maps will afford a better comprehension of the controversy.

The senior of all the surrounding surveys is H. & T. C. block 46, located along the south bank of the Canadian river. This block of surveys begins in Roberts county on the east and extends entirely across Hutchinson county, numbered serially westward, and the field notes thereof were prepared by Maddox in June and July, 1874, and filed in the general land office on September 15, 1874. No survey of these lands on the ground in Hutchinson county was made at that time, however; the field notes having been prepared by one of Maddox's deputies in his office at Sherman and platted to border upon the Canadian river according to information as to the location of said river then in his hands acquired from surveys he had made north of the river. See Sanborn v. Gunter & Munson, 84 Tex. 284, 17 S. W. 117, 20 S. W. 72. This set of field notes was inaccurate and of little value. In 1888 George Spiller made an actual survey on the ground of block 46, established the corners of surveys 60 to 69, here involved, and filed corrected field notes of these surveys in the general land office. These field notes were approved, patents issued thereon, and the lines of said surveys as located by Spiller are definitely established and are now easily found upon the ground.

Block Y was surveyed in 1875, and the field notes thereof filed in the general land office; and the location of the north line of this block on the ground as originally surveyed is not here controverted. It may be considered as established, fixed, and certain when the Whitley Survey was located and patented.

Block B4 was originally surveyed in 1878 and field notes returned to the general land office. The beginning corner of this block was called for as the southwest corner of survey 60 of block 46. Survey No. 3 of this block was patented in 1880 upon the original field notes thereof. The indorsement on the general land office record of survey No. 4 of said block is "cancelled." It is not controverted, however, that block B4, according to its original field notes, conflicted with block Y on the south to the extent of about 600 varas. Nor can the bearing trees called for in survey No. 2 of said block, upon which survey the other surveys in said block were constructed, be now located with certainty on the ground. However, for the purposes of this suit, we may accept the contention of the state that the lines of surveys 3 and 4, here involved, of said block B4, as they are now accepted, were definitely established on the ground in 1889, when the Whitley was located. The lines and corners of these two surveys appear to have been accepted and recognized by the owners of said lands as fixed on the ground for many years prior to the discovery of oil and the consequent filing of this suit.

The E. Tumlinson and Mary Whitley certificates were issued in 1881 and each called for . 1,280 acres. Gunter and Munson, who then owned both certificates, in a single application dated November 25, 1881, filed with the surveyor for the Jack land district a request for the location of these certificates on certain vacant lands, the first of which tracts was described as follows:

"Beginning at a point in the south line of Survey 61 in Block No. 46 for the Houston and Texas Central Railroad Co. where said Block 46 intersects the West line of Survey No. 2 in Block B 4.

"Thence West and South with the S. and E. boundary lines of said Block No. 46 until it intersects the North line of Block y.

"Thence East with the North line of said Block Y, to a point in the W. line of Survey No. 4, in Block B 4,

"Thence North to its N. W. corner;

"Thence East to the S. W. corner of Survey No. 3 in said Block B 4;

"Thence North to the Place of Beginning; meaning hereby to file on all vacant land lying South of said block 46, North of Block Y and West of Block B4, as far as the N. W. corner of Block Y."

This application also contained the following: "Should there be an excess of land after exhausting the certificates herewith filed, you will leave it out the extreme East end of the tract herein first described."

On July 1, 1882, this application, together with field notes of the Tumlinson, certified to have been surveyed on February 1, 1882, and field notes of the Mary Whitley, certified to have been surveyed on February 2, 1882, were filed in the general land office, and patent issued on the field notes of the Tumlinson on December 27, 1883. The south line of the Tumlinson called for natural objects and bearings now definitely located on the ground. Its east line called to be 1,456 varas long and for adjoinder on the south line of survey 69 in block 46, thence west with the south lines of block 46, closing on the north line of block Y.

The field notes of the Mary Whitley, prepared by McLean, called to begin at an artificial mound at the N. E. corner of survey 13 of block Y, thence east 556 varas to the lower

southeast corner of the Whitley; thence north with the west line of survey 4 of block B4 1,413 varas to its northwest corner; thence east 1,344 varas to its northeast corner; thence north 1,700 varas to the south line of survey 61, block 46; thence west 419 varas to its southwest corner; thence with the lines of block 46 westward to the Tumlinson survey; thence south with the east line to its established southeast corner; thence closing on the north line of block Y. McLean undoubtedly knew the location on the ground of the east line of the Tumlinson and the north line of block Y. But it may be doubted that he knew the true location of block B4, since he called for a distance from his beginning corner of 556 varas to the west line of block B4, whereas the true distance is only 207.5 varas. We think it is conclusive, however, that he did not know the location on the ground of the south lines of block 46, because they, so far as the record shows, had never been actually located on the ground, and Maddox' field notes of same were prepared in his office on inaccurate data; and the true location of these surveys was not made until seven years later by Spiller by an actual survey on the ground. We think it equally true and apparent, however, that McLean intended, as called for in the application for its location, to include in its boundaries all of the vacant lands between block 46, block B4, block Y, and the Tumlinson. Such also was the clear intention of the land commissioner, because the Tumlinson was located on the same application, and was patented, including all the lands therein described between block 46 and block Y.

However, McLean's field notes of the Whitley were not accepted by the general land office. For what reason is not expressly shown. The only notation thereon in the general land office is, "Contains 1550 acres Sept 6/82," and an undated notation, "Cancelled by corrected field notes." It may reasonably be inferred, we think, that the rejection of McLean's survey of the Whitley, which in part at least was obviously an office survey, was due to his inclusion therein of 1,550 acres when the donation certificate called for only 1,280 acres; or because of the uncertainty of the true location of block 46.

The next survey of the Whitley, according to field notes filed in the general land office on May 18, 1883, is certified to have been made by J. W. Wells on January 8, 1883. This survey called to begin at the same starting point as that of McLean, followed substantially the east lines of the Whitley as called for by McLean, but changed materially McLean's calls for the north lines of the Whitley. Wells' survey did not call for adjoinder to block 46 on the north; and on the west called to adjoin the east line of the Tumlinson for a distance of 1,171 varas to the Tumlinson

southeast corner; thence east following the same line and distance called for by McLean. Wells' field notes for the Whitley contained 1,280 acres. These field notes, however, were not accepted by the general land office, and the records of that office disclose the notation thereon, "Cancelled by corrected field notes."

The next survey of the Whitley was that made by Yarbrough, dated June 17, 1889, on which the land was patented to Gunter and Munson, on February 21, 1895. In June and July of 1888, Spiller had definitely located on the ground the adjacent surveys of block 46, the northeast corner and southeast corner of 61; the northwest corner of 65, being also the northeast corner of 66; and the southwest corner of 68, and the southeast corner of 69, all being definitely located by natural and/or artificial objects and bearings now identified and recognized. Spiller called for points on the south bank of the Canadian river as corners of surveys 60 to 69, all of which north corners were located by bearing trees or natural or artificial objects. The back or south lines of surveys 62 to 67, inclusive, of block 46, were located by Spiller by calls for course and distance and for mounds now incapable of identification. The Yarbrough survey of the Whitley is admittedly an office survey. It is not controverted, however, that he had before him the field notes of block 46 as made by Spiller, and followed those field notes in detail for his north line of the Whitley. These field notes for the Whitley called to begin at the northeast corner of survey 13, in block Y, as did McLean; thence following the same calls that McLean made to the northeast corner of survey 4 in block B4; thence north with the west line of survey 3 in block B4, 1,219 varas (McLean called to run 1,700 varas north to the south line of.61) for the northeast corner of the Whitley; thence west 50 varas to the southeast corner of survey 62 in block 46; thence following the south lines of block 46 according to Spiller's field notes for same to the northeast corner of the E. Tumlinson in the south line of survey 69; thence south with the E. Tumlinson east line 801 varas to its southeast corner on the north line of block Y; thence following McLean's calls for block Y to the place of beginning.

It is clear, therefore, that Yarbrough adopted and followed McLean's location of the Whitley boundaries on the west by the Tumlinson; on the south by block Y; on the east by block B4 as far as the west line of survey 3 of that block. On that line he ran north 1,219 varas instead of 1,700 varas as did McLean, and then turned west 50 varas to block 46 as established by Spiller seven years after McLean had first located the Whitley. Yarbrough's field note calls for the north lines of the Whitley, being also the south lines of block 46, vary widely from McLean's field note calls for these same lines,

but both called for adjoinder. McLean called according to his location of block 46 for the west line of the Whitley, being the east line of the Tumlinson, to run north and south 1,456 varas. Yarbrough, with Spiller's actual location of block 46 before him, called for the same line or distance between block 46 and block Y at this point to be only 801 varas. As now surveyed on the ground, it is shown to be approximately 1,370 varas.

It is the theory of the state, on which the trial court obviously rendered its judgment, that McLean ran out on the ground the lines of the Whitley survey, and that the lines of the Tumlinson, block Y, and block B4 are definitely fixed on the ground and located as called for by McLean, that Yarbrough, in adopting the calls for these surveys as boundaries of the Whitley, thereby adopted fixed lines for the west, south, and east lines of the Whitley, but that he did not know the true location of block 46 on the ground, erroneously called for its lines by conjecture, and that therefore the Whitley must be constructed by the course and distance calls of Yarbrough from these fixed lines on the west, south, and east.

Map A shows the sketch of McLean's survey of the Whitley and his location of the surrounding surveys, returned by him to the general land office at the time he filed his field notes.

## MAP A

Map B shows Yarbrough's sketch of the Whitley and his location of the same surveys after Spiller had located as it now is accepted on the ground, block 46, returned to the general land office with his field notes; and which was accepted as correct by the land office and on which the Whitley patent was issued.

MAP B

Map C shows the Whitley survey as located according to the state's contention, and shows the strip found by the trial court as vacant school land between that location and the south lines of block 46 as located on the ground by Spiller.

We think the following conclusions are obvious and inescapable:

(1) That McLean did not survey the north lines of the Whitley, and did not know the true locations of the back lines of the surveys in block 46, because they had not, so far as

MAP C

the record discloses, ever at that time been actually surveyed and located upon the ground; that he placed them in his sketch further north than they should have been; and that he intended to make the Whitley survey adjoin block 46 and cover all the vacancy between that block and block Y as the owners of the Whitley certificate had applied for.

(2) That Yarbrough, when he prepared his field notes of the Whitley, had Spiller's actual location of block 46 on the ground before him; that his correction of McLean's field notes was for the purpose of reducing McLean's acreage in the Whitley below the 1,550 acres included in McLean's field notes, leaving such excess in the east end as requested by Gunter and Munson in their original application; and to definitely define the Whitley north lines in keeping with the south lines of block 46 as same had been actually established on the ground by Spiller less than a year before.

█ The only issue submitted to the jury, and which was by them answered in the negative, was: "At the time of the preparation by the surveyor Yarbrough of his field notes of the Mary Whitley Survey, did he know with reasonable certainty the location on the ground of the Spiller lines and corners of surveys in Block 46, H. & T. C. R. R. Co., called for in the Yarbrough field notes of the Mary Whitley Survey? Answer yes or no."

While we think this finding is contrary to the great preponderance of the evidence, we do not deem it determinative of the issues involved. Whether Yarbrough actually knew the physical location on the ground of the back or south lines of surveys 62 to 67, inclusive, of block 46, all of which were called for as the north lines of the Whitley, those lines had in fact been definitely located by Spiller the year before; and, whether to be found as marked lines on the ground or not, they were capable of definite ascertainment and location from established corners, not only of adjacent surveys, but from the river corners of the surveys themselves. There is no question but that Spiller had established by natural objects, monuments, or bearing trees, or by all such markings, fixed locations for the northeast corner of survey 61, the southwest corner of 60, the southeast corner of 61, the southwest corner of 68, and the southeast corner of 69, all of which are now recognized and established on the ground. He had also fixed marked corners with bearings on the north for all intervening surveys between 60 and 69 on the south bank of the Canadian river, a natural object whose location was well known to all of said surveyors. The back or south lines of the intervening surveys, called for at definite courses and distances from river corners, were therefore definitely ascertainable from established corners on three sides of this tier

of eight surveys, each 950 varas wide, whose location east and west was definitely fixed and whose north and south location was merely a matter of running out their call distances from their established river corners. That being true, we think the location of their back or south lines was established as a matter of law, whether actually marked by objects and bearings on the ground or not. They were therefore, as stated in Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237, entitled to be given the dignity of an "artificial object" and calls therefor to prevail over course and distance. See, also, to the same effect, Davis v. Baylor (Tex. Sup.) 19 S. W. 523, 524; Baker v. Light, 80 Tex. 627, 16 S. W. 330; Camp v. Gulf Production Co. (Tex. Sup.) 61 S.W.(2d) 773; 7 Tex. Jur. 185, and cases there cited.

██ It would serve no useful purpose to discuss or seek to differentiate the numerous cases cited and reviewed by the parties hereto in their respective briefs. The cardinal principles governing the location of surveys and their boundaries are well settled, and the cases applying them are legion. Where the footsteps of the surveyor can be followed with certainty in case of a survey on the ground, all conflicts in calls or ambiguities in field notes are subordinated to the actual location on the ground by the surveyor. His actual survey of the land on which the grant is made where it can with certainty be ascertained is conclusive. Another cardinal rule of equal import is that controlling effect will be given to the intention of the parties to the grant, and, when that can be definitely ascertained, all else must yield to and be governed by it. And these rules apply to grants by the state.

We think the following conclusions as to the surveys of the Whitley are without question:

That McLean did not survey the north lines of the Whitley; that he knew the general location of block 46, but not the definite location of its south lines, for the reason that at that time they had not been established on the ground; and that he did not know the true distance between the north line of block Y and the south lines of block 46.

That Yarbrough, when he made his office survey of the Whitley, had McLean's location of established lines of the Tumlinson on the west, block Y on the south, block B4 on the east, Spiller's location of block 46 on the north, and field notes from which Spiller's location of that block could be definitely ascertained on the ground; and that he knew with reasonable certainty the general location of block 46, and the location and course of the Canadian river. These conclusions are, we think, inescapable and to be arrived at independent of appellant's contention that Yarbrough himself located on the ground in 1889 Spiller's northeast corner and south-

744

east corner of 61, the southwest corner of 60, and the north corners on the river of surveys 60 to 69.

As to Yarbrough's location on the ground of these corners bearing on the issue of his actual knowledge of the location of block 46 at the time he made his field notes of the Whitley, the record discloses substantially the following: Both McLean and Yarbrough are dead. Yarbrough's field notes recite that D. H. Arnold and W. H. Simpson were his chain carriers, and that the Whitley was surveyed on June 17, 1889. D. H. Arnold and W. E. Simpson, son of W. H. Simpson, then a lad about fourteen years old, and who was with Yarbrough's surveying party at the time, both testified. Their testimony is without material contradiction that Yarbrough and his party had surveyed some two or three weeks north of the Canadian river in the late spring of 1889; that they then moved south of the river, where Yarbrough located a corner at the mouth of Dixon creek (the accepted northeast corner of 61 and northwest corner of 60); that they surveyed south a distance of 1½ or 2 miles where they found two rocks set in the ground (accepted and still found as the southwest corner of 60 and the southeast·corner of 61 established by Spiller); that they then returned to the river at the mouth of Dixon creek and moved up the Canadian river, the surveyor Yarbrough, the witness Simpson, and his father walking along its south bank looking for corners, some of which Yarbrough found, and again camped on Antelope creek, where they surveyed south from the river a couple of days and then returned home. Two other witnesses, who were cow hands then engaged in a round-up in that vicinity, also testified that they saw a surveying party camped on Dixon creek, south of the river, at that time in which Arnold and Simpson, whom they then knew, were parties.

The only contradiction the state urges to this testimony is· that the witnesses, when interrogated before the trial by state's attorneys, were vague and uncertain as to what happened; had made some statements somewhat contradictory; that Yarbrough's field notes of the Whitley made no mention of these established corners; and that the Whitley survey bore the same date, i. e., June 17, 1889, as other field notes of Yarbrough prepared from a survey on the ground north of the Canadian river, some 40 miles removed from the Whitley. We have read carefully all of the testimony of these witnesses, and it can in our opinion be readily harmonized. That after a lapse of forty years man's recollections of such matters when first broached about them are hazy and uncertain but comports with human experience. After the witnesses had gone on the ground, talked with surveyors in the light of such matters, and with each other, it is but natural

that many details would come definitely to mind. Failure of Yarbrough to describe in his calls for the Whitley the corners of 60 and 61 may readily be understood because his field notes for the Whitley did not call for adjoinder to either of those surveys, and constituted no evidence, we think, that he did not know the location on the ground of surveys 60 and 61 of block 46. The fact that his field notes of the Whitley bore the same date as that of other surveys actually run out on the ground 40 miles away is readily explained by the testimony of experienced surveyors that frequently surveyors in the field at the time and under the circumstances then obtaining in that sparsely settled area merely recorded their work in their field book on the ground, and, after returning to their offices, made· up their plats and field notes, giving them the date of the office compilation instead of the dates the work was done in the field. In fact, this record discloses sets of field notes to actual surveys of large bodies of, and numerous tracts of, lands all bearing the same date, which the court judicially knows it was impossible for the surveyors to have actually ·run out on the ground on the date given. The witnesses were disinterested, and their testimony harmonizes with the physical facts on the ground, and we think their testimony is without substantial contradiction and leads to the inescapable conclusion that Yarbrough did, prior to his making of the Whitley field notes, ascertain and locate on the ground the location on the ground by Spiller of the common line between surveys 60 and 61 of block 46 with its marked corners, and that he knew the true location of the Canadian river marking the north lines of block 46.

That there were mistakes in the calls · for distance for the west line of the Whitley, being the east line of the Tumlinson, between block Y and block 46, is obvious. McLean made it 1,456 varas and Yarbrough 801 varas. Both were mistaken as to the true distance. There being no way to trace the footsteps of the surveyors in either instance, and the survey on which the patent was issued being an office survey, the inquiry is, What was the intention of the surveyor and of the parties to the grant, as gathered from the terms of the grant, taken in the light of all the surrounding facts and circumstances? See 7 Tex.,Jur. 123, and cases there cited. The facts and circumstances were:

In their original application Gunter and Munson applied for all the vacancy to be embodied in the Whitley certificate then existing (1881) between the adjoining senior surveys, leaving the excess, if any, over the 1,280-acre certificate to the east. McLean in his location undertook to include all such vacancy in the Whitley. His field notes were not accepted by the general land office

obviously for two reasons, that they included 1,550 acres instead of 1,280, and inferentially because the true location of block 46 had not then been actually surveyed and established on the ground. Thereafter, in January, 1883, Wells, presumably upon instructions from the general land office, laid out the Whitley from the three established surveys on the west, south, and east by field notes containing 1,280 acres, but not calling for adjoinder with block 46. These field notes were not accepted by the general land office, and the inference is, we think, that the land commissioner desired to absorb in the Whitley the vacancy between block Y and block 46 east of the Tumlinson as far as the 1,280-acre certificate would carry the Whitley, and to make the Whitley adjoin block 46 on the north. After Spiller, presumably upon instructions from the land commissioner, had located block 46 on the ground, Yarbrough made his survey of the Whitley, also presumably upon instructions from the general land office, again calling for adjoiners all around for established senior surveys, and obviously sought to carry out the request of Gunter and Munson to leave any excess over 1,280 acres to the east, because on that side he stopped short of McLean's calls for the Whitley. Clearly it was his purpose to adjoin the Whitley to the south lines of block 46. Otherwise we can see no reason for his seeking to locate Spiller's lines of that block by his survey along Dixon creek in 1889 and his hunting for river corners of these surveys, preparatory to, and obviously for the purpose of, preparing his plat and field notes of the Whitley, which were thereafter accepted by the land office and patent issued thereon. While he was mistaken as to the distance between block Y and block 46 on the west, he called for both the southeast and northeast corners of the Tumlinson which he knew adjoined both blocks, called for adjoinder to both block Y and block 46, and we think the conclusion is inescapable that, had he known the true distance between said blocks at that point, he would have called for it.

All official maps or plats prepared by surveyors for the state show the Whitley to adjoin both block Y and block 46; the maps of the general land office of 1898 and 1922 show such adjoiners, except that as to a small vacancy awarded to Whittenberg out of the east end of the Whitley as originally platted, lying south of surveys 61 and 62, and east of 63 of block 46. This obviously was awarded in keeping with the original request of Gunter and Munson to locate any excess in the Whitley there, and that tract does not include any of the lands recovered by the state in this suit. In 1908 J. A. Whittenberg, one of the appellants here, applied for the same lands recovered by the state herein, together with additional lands to the east, as vacant lands, and the land office refused to recognize any such vacancy except the small tract south of surveys 61 and 62 of block 46, on the ground that the Whitley included all lands between surveys 62 to 68, block 46 and block Y.

From these facts and circumstances we think it conclusive that it was the purpose of Yarbrough and the manifest intention of all parties to the grant, as indicated by the language of the patent calling for adjoiders with surveys then established, by the surrounding facts and circumstances, and the records of the general land office to include within the Whitley all the lands sought to be recovered by the state; and that such intent should be given effect.

As stated in Woods v. Robinson, 58 Tex. 655: "The rules for the construction of grants, and for ascertaining their boundaries, which have from time to time been announced by the court and have been acted on in establishing their lines, are all designed for the purpose of carrying out the intention of the grantor. When this intention is once made manifest, all else must yield to and be governed by it. Robertson v. Mosson, 26 Tex. 248; Swisher v. Grumbles, 18 Tex. 164."

And, where an established line of a senior survey is called for, or a line of a senior survey which may be definitely ascertained and located from other established corners of the same or adjacent established surveys, such call should be given the dignity of an artificial object and control calls for course and distance. Maddox v. Fenner, 79 Tex. 279, 15 S. W. 237; Coleman County v. Stewart (Tex. Civ. App.) 65 S. W. 383; Steward v. Coleman County, 95 Tex. 445, 67 S. W. 1016; Boon v. Hunter, 62 Tex. 582; Finberg v. Gilbert, 104 Tex. 539, 141 S. W. 82; Kirby Lumber Co. v. Gibbs Brothers & Co. (Tex. Com. App.) 14 S.W.(2d) 1013.

The case at bar is very similar in many respects, and the issues the same, as those involved in Isaacs v. Texas Land & Cattle Co. (Tex. Civ. App.) 99 S. W. 1040, wherein the court looked to the grant as evidenced by the field notes, patents, and maps of the general land office as disclosing the intention of the parties, and made the calls for course and distance yield to and conform to surrounding senior surveys. Writ of error was refused in that case. The Supreme Court, in adopting an opinion of Judge Critz, in Camp v. Gulf Production Co., supra, not yet published [in State report], wherein several of the above-cited cases are discussed and the pronouncements therein reaffirmed, applied these rules to an alleged vacancy where adjoiners were called for, and held that calls for senior established surveys control calls for course and distance.

Our conclusion herein renders unnecessary a discussion of the numerous other

issues presented. While we are cognizant of the fact that these lands have become immensely valuable since the discovery of oil thereunder, and that surveys in that section of the state were often inaccurately made and frequently by such methods included excesses in acreage, then of little value, which but for the hardships and barren nature of the land would probably never have occurred, but where the intent as then manifested is clear and patent, the increased values of such lands furnish no reason for any departure from well-settled rules of decision and the construction of grants made a generation ago, and adhered to consistently by the courts.

For the reasons stated, and since we have concluded that the record shows conclusively that no such vacancy exists as was decreed to the state, the judgment of the trial court is reversed, and judgment here rendered for the appellants.

Reversed and rendered.