TURNBOW et al. v. BLAND et al.

No. 14118.

Court of Civil Appeals of Texas. Fort Worth.

Feb. 21, 1941.

Rehearing Denied April 4, 1941.

Gerald C. Mann, Atty. Gen., and R. E. Kepke and James Noel, Asst. Attys. Gen., for appellant State.

Edwin M. Fulton, of Gilmer, Hendricks Brown and Mike E. Powell, both of Fort Worth, and Trueheart, McMillan & Russell, of San Antonio, for appellant Turnbow.

Florence & Florence, of Gilmer, for appellees.

McDONALD, Chief Justice.

This is a suit in the form of trespass to try title, brought by J. F. Bland and others against W. C. Turnbow, in which the State of Texas intervened as a party defendant. The suit is principally one of boundary. It is what is sometimes referred to as a vacancy suit. Plaintiffs were the landowners and those claiming mineral interests under them. Turnbow and the State sought to establish a vacancy 50 varas wide between the east line of the David Ferguson Survey and the west line of the G. W. Hooper. The land in controversy lies in Upshur County. Turnbow was the holder of mineral grants covering the alleged vacancy, the first issued to him on October 26th, 1938, by Wm. H. McDonald, Commissioner of the General Land Office, and the second, a corrected grant, issued to him on April 22nd, 1939, by Bascom Giles, the succeeding Land Commissioner.

Plaintiffs alleged that the mineral grants in question were invalid because there was no vacancy between these two surveys.

Contemporaneously with the filing of this suit, there were also filed three other suits, by landowners similarly situated, in the District Court of Upshur County, against Turnbow, in which the State intervened. By agreement of the parties the four suits were tried together, under a stipulation that all evidence, as far as applicable, should be considered in all four causes, but that a separate judgment should be entered in each.

After the close of the testimony, the parties agreed that the jury should be dismissed, and the causes were submitted to the court.

The court rendered judgment in favor of all of the plaintiffs, and against the defendant Turnbow and the State, adjudging that there was no vacancy between the two surveys, and that the mineral grants to Turnbow were for such reason invalid.

Turnbow and the State have appealed, the four causes being submitted together in this court, although separate judgments will be rendered here, as was done in the trial court. Turnbow v. Free, 149 S.W.2d 615; Turnbow v. Richardson, 149 S.W.2d 616; Turnbow v. Free, 149 S.W.2d 617.

The cause was tried by all parties on the theory that both surveys were actually surveyed on the ground, and the testimony related to the search for the footsteps of the surveyors on the ground.

The trial court found that the surveyor who surveyed the Ferguson, the junior survey, actually went to the east of the west line of the Hooper, thus creating an overlap, and that consequently the east line of the Ferguson, as a matter of law, became a common line with the west line of the Hooper, the older survey, eliminating any possibility of a vacancy between the two surveys.

The trial court, in rendering judgment, ordered that a certain map, plaintiffs' Exhibit K, be filed with the clerk of the court, and be retained as a part of the papers in the cause, in order better to understand and identify the findings of the court.

We include here a rough sketch showing the general location of the Hooper, Ferguson, and some of the surrounding surveys. The sketch is not drawn to scale, and is for purposes of illustration only. The tracts lettered a, b, c, and d, indicate the general location of the respective lands owned by plaintiffs.

In our review of the judgment of the trial court, we are guided by the rule of law announced in 3 Tex.Jur. page 1102, and in decisions of our courts too numerous to mention: "The findings of the trial court in a case tried without a jury have the same force and are entitled to the same weight as the verdict of a jury; and it is

The surveyor witnesses for both sides testified in detail regarding the work they did in seeking the boundary lines in question, and were in turn cross-examined at great length. They all made studies and comparisons of the field notes of surrounding surveys, and searched on the ground for lines and corners of surrounding surveys that might be helpful in locating the lines of the Hooper and Ferguson. Each of them produced maps purporting to show the results of the work he had done, and each of them, particularly upon cross-examination, was required to scale distances from various points shown on his map to test the accuracy of his work, and to present the respective theories of the parties.

The efforts being to trace the footsteps of the original surveyors, the case presented questions principally of fact, rather than law.

well settled that such findings will not be disturbed by an appellate court where there is some evidence to support them, even though the evidence is conflicting and the appellate court might have reached a different conclusion therefrom. It is also well settled that findings of fact by the trial court will be upheld unless they are manifestly erroneous, and that they will be overruled only where they are without any evidence to support them, or where they are so against the great weight and preponderance of the evidence as to be manifestly wrong."

The only surveyor witness testifying for the plaintiffs was Ben Garrett, who prepared the map, plaintiffs' Exhibit K, which the trial court referred to in his judgment. The court, in his judgment and in his findings of fact, adopted the findings of Garrett's survey as reflected on this map.

Garrett testified in great detail regarding the work he did on the ground, and the study he made of the surrounding surveys, and we believe that the trial court was justified in accepting his testimony as correct.

The Hooper, King, Woodfin, Sanches, Hathaway, Castleberry, Rankin, McCray (also known as the Marshall Mann) and the Robinson (also known as the Robertson), were all surveyed in the year 1838. All except the Hathaway were surveyed in the spring of that year. The Hathaway was surveyed in November, 1838. Although from the dates of the field notes it would appear that some of the surveys were made before others, yet, several call for corners or lines of surveys of later date. For instance, the Sanches, dated April 20th, calls for lines of the Hooper, dated May 14th. The King, dated May 10th, calls for the north line of the Hooper, and to pass the northwest corner of the Hooper.

The situation appears to be the same as that discussed by the Austin Court of Civil Appeals in Phillips Petroleum Co. v. State, 63 S.W.2d 737, writ refused, where it is said that the surveyors probably recorded their work in field books on the ground, and after returning to their offices, made up their plats and field notes, giving them the date of the office compilation instead of the date the work was done in the field.

We point this out because appellants make much of the fact that the Wm. King notes are dated four days earlier than the Hooper notes, the relevancy of which will appear.

The only lines or corners of surrounding surveys called for in the Hooper notes are as follows: (1) The notes call to begin at its northwest corner, and at the northeast corner of a survey the bearing trees of which are marked C. H. The bearing trees of the Rankin are marked C. H. (2) The southeast corner of the Hooper is called to be in the west line of a survey which all parties concede to be the Robinson, and at 520 varas north of the southeast corner the Hooper notes call to pass the northwest corner of a survey conceded by all parties to be the Robinson. (3) The northeast corner of the Hooper is called to be in the south line of a survey conceded to be the McCray. Going west from the northeast corner of the Hooper, the notes call to go along the south line of the McCray, pass its southwest corner, thence along the south line of a survey marked TNC, which, from

the evidence, is bound to have been the King and Woodfin.

The Rankin survey was abandoned, and a part of it is now occupied by most of the Ferguson Survey. The Woodfin and King Surveys were made the same day by the same surveyor, and the east and south lines of the two surveys appear to be the same, except that the Woodfin appears to go farther north and farther west.

The same man, G. W. Hooper, surveyed the King, the Woodfin, and the Rankin. The Rankin and Hooper notes bear the same date. The Rankin calls to begin at the northwest corner of the Hooper, and the Hooper calls to begin at the northeast corner of the Rankin, and both call for the same kind of witness trees and at the same course and distance at this corner. The King, surveyed by the same man who surveyed the Rankin, in going west from its southeast corner, calls to pass the northwest corner of a survey marked GWH at 3600 varas.

This last call is the subject of much controversy in this case.

Appellants contend that Garrett's reconstruction of the Hooper Survey is built entirely upon this passing call in the King notes. We believe, as we will show, that Garrett's reconstruction of the Hooper was not built upon this passing call, but that the passing call in the King notes is a circumstance supporting his testimony and the findings of the trial court.

The testimony of Garrett, concerning his work on the ground and his efforts to locate the west line of the Hooper, that is to say, where McClelan actually ran the Hooper west line, is in part as follows:

He began his work on the ground in the area where he thought the southeast corner of the King was located. He testified that there was not much dispute among surveyors as to the location of the southeast corner of the King. From passing creek calls in the Woodfin, King and McCray notes, he made a tentative location of the southeast corner of the King, and then made a search for witness trees. At the proper course and distance he found the root system of a large hickory tree, and a large pine stump standing two feet above the surface. These were the kind of trees called for at the respective locations in the King notes.

He then went west 3600 varas and set a stake for future reference. In going west

he found a creek and the old Nacogdoches Road at approximately the proper distances called for in the Woodfin notes, the creek, or bayou, also being called for in the King notes. He continued west to what he considered the vicinity of the southwest corner of the Woodfin Survey, and there made a search for witness trees. He found a large post oak tree marked TNC, which was the marking of witness trees of the Woodfin and King Surveys. He cored the tree, finding that the marking was made over a hundred years before. There was a considerable amount of testimony about this TNC tree. Plaintiffs' witnesses testified that they could distinguish the markings on the tree, defendant's witnesses testified that they could not. The trial court saw and heard the witnesses, and apparently believed those who said they could distinguish the markings. The testimony being in conflict, the findings of the trial court are binding on appeal.

Reversing the call in the Woodfin notes for the witness tree, he found a rock mound at the proper distance. Proceeding from the rock mound the course and distance set out in the field notes for the other witness tree, he found the root system of a red oak, the kind of tree called for in the field notes. From this data he set up this corner on his map as the southwest corner of the Woodfin. No patent was issued on the Woodfin notes. Later, a patent was issued covering the J. R. Wadkins Survey, in this area, and the witness trees called for in the Wadkins notes are of the same kind and at the same course and distance as those called for in the Woodfin notes, and both are called to be marked TNC. So it may be reasonably concluded that the southwest corner of the Wadkins and the southwest corner of the Woodfin are the same.

Then, going back to the stake he had temporarily set at 3600 varas west of the southeast corner of the King, he began a search for the witness trees called for in the Hooper notes at its northwest corner. From this temporary stake, at the course and distance called for in the Hooper notes, he carefully removed the top soil, and at about eighteen inches below the surface began to trace a root system to the place the roots led into a stump. Reversing the call from what he considered to be the center of the stump, he relocated his stake, finding it to be 3599.2 varas west of the southeast corner of the King, and 2.59 varas

south of the line running from the point he had located as the southeast corner of the King to the point he had located as the southwest corner of the Woodfin.

At the course and distance the Hooper notes called for the other witness tree, he uncovered quite a root system of what he considered a hickory tree, which was the kind of tree called for at this position in the Hooper notes. The course and distance of these two root systems, from the place he had last located his tentative corner, compared exactly with the calls in the Hooper notes. Then, digging below the surface at this location, he found, in a vertical position, the decayed remains of a very old oak stake. The location of this oak stake represents the location of the northwest corner of the Hooper survey as set out on the Garrett map and as found by the trial court.

Garrett then proceeded south from this point. The Hooper notes call to cross the Cherokee Trace (an old road) at 1020 varas. Garrett crossed it at 1026.23 varas. The Hooper notes call to cross a creek at 3850 varas. Garrett crossed it at 3862.8 varas. He continued south to a point which he considered to be the inner ell corner of the Hathaway Survey.

It is well here to discuss the Hathaway Survey.

Hugh McClelan, who surveyed the Hooper in May of 1838, also surveyed the Hathaway, in November of the same year. His notes call to begin at the southeast corner of the Hooper, thence south 846 varas, thence west 5250 varas, thence north 485 varas, to the south line of a survey marked CH (the markings of the Rankin), thence east 440 varas to a corner, calling for a tree marked CH, thence north "with the E boundary of said survey" (evidently the Rankin) 361 varas to the southwest corner of the Hooper, thence east with the south boundary of the Hooper 4810 varas to the place of beginning. According to its calls, the lower part of the Hathaway goes 440 varas farther west than does the Hooper. McClelan, having made both surveys, evidently must have known where the southwest corner of the Hooper was when he surveyed the Hathaway. It will also be observed that the inner ell corner of the Hathaway appears to be the southeast corner of the Rankin, and it will again be remembered that McClelan called the northwest corner of the Hooper to begin at the northeast corner of the Rankin. So it may

reasonably be supposed that he also knew the location of the southeast corner of the Rankin when he called the inner ell corner of the Hathaway to be at the same place. At approximately the course and distance called for in the Rankin and Hathaway notes, for a witness tree at this corner, marked CH, Garrett found a large pine stump, and at this point he found a rock mound.

Garrett continued south from this point to the south line of the Hathaway Survey, and then measured west to the southwest corner of the Hathaway, which is also the beginning corner of the Ferguson Survey, and the location of which was found to be the same by all of the surveyors for both sides in this case. Garrett found this distance to be 440.95 varas, only a fraction of a vara different from the distance in the fourth call of the Hathaway notes.

To our minds, remembering again that the same man surveyed both the Hooper and the Hathaway, this is one of the circumstances most strongly supporting Garrett's theory of the location of the west line of the Hooper. From his field notes, McClelan must have located the most western line of the Hathaway 440 varas west of what would have been a south extension of the west line of the Hooper. Garrett found the distance between the two lines to be 440.95 varas, practically the same as found by McClelan.

Garrett set up the southwest corner of the Hooper, on his map, at a point 4800 varas south of his beginning corner. He could not find any evidence of witness trees at this corner.

He then went east, locating his southeast corner of the Hooper at a point 4814.8 varas (call distance 4810 varas) east and slightly north of the point he had set up as the southwest corner. He, as well as the surveyors used by appellants, located his southeast corner of the Hooper with reference to the northeast corner of the Castleberry and the southeast corner of the Hathaway. Each surveyor presented his theories as to the location of this latter corner, and the trial court accepted the theory presented by Garrett. About the most significant point we notice as to this corner (of the Castleberry and Hathaway) is this: The field notes of the Hathaway call the south line to run 5250 varas. Garrett established his southeast corner of the Hathaway at 5256.84 varas from the agreed southwest corner, while appellants' surveyors established their southeast corner at

5288 varas east of the southwest corner. This, to our minds, is a circumstance tending to support Garrett's theory as to the location of the east line of the Hooper.

After establishing on the ground the point which he set up on his map as the southeast corner of the Hooper, Garrett surveyed north. At 520 varas (called for in the Hooper notes as the northwest corner of the Robinson) he found himself 2 varas south and 3 varas west of an old fence corner, but did not find any evidence of the Robinson witness trees. At 4800 varas north he found himself in an old orchard. Here he plowed up an area 115 feet square, searching for root systems or buried stumps of the witness trees called for in the notes, stopping any time the plow encountered any substance of this nature. In so doing he located a large pine tap root. Reversing the call for a witness tree pine contained in the Hooper notes, he established what is shown on his map as the northeast corner of the Hooper. The point so found was 4800.5 north, no degrees 5½ minutes west from Garrett's southeast corner of the Hooper. And from this corner, at the course and distance called for in the Hooper notes, he also found the roots of a blackjack tree, the kind of tree called for in the field notes.

From there he proceeded to what he had located as the southeast corner of the King, and from there to his beginning point.

It is well to point out here that appellants' surveyors located the southeast corner of the King at a point a few varas north, but in practically the same line, east and west, as did Garrett.

We have set out this testimony in considerable detail because, if the trial court was justified in believing it, it eliminates any possibility of a vacancy between the two surveys, regardless of which location of the east line of the Ferguson is accepted, as will appear later in the opinion.

Except for certain questions relating to proof of title, which will later be considered, the judgment and findings of the trial court are, in the assignments of error, attacked upon two grounds: First, "because there is no competent evidence of any probative force" to support same; second, "because the evidence supporting said judgment is so against the great weight and preponderance of all the evidence as to render the judgment manifestly wrong, in that the court ignores the material, direct, positive and controlling evidence." The quota-

tions are taken from the assignments of error.

Appellants' theories regarding the trial court's findings, and regarding the location of the west line of the Hooper Survey, may be summed up as follows:

They charge that the trial court has fixed the beginning point from the passing call in the Wm. King notes.

They charge that Garrett's testimony relating to the root systems, buried tree stumps, the buried stake, and the "TNC" tree, is so unreasonable that it has no probative force, and can furnish no support for the trial court's judgment and findings.

They contend that the most certain and reasonable evidence establishes the northeast corner of the Hooper at a point 58 varas easterly from the point found by the trial court; that all original markings on the west line have disappeared; and that the only means left for determining the west line is by course and distance from what appellants contend is the east line.

The surveyor witnesses used by appellants were W. E. Jones, J. E. Beavers, and W. D. Elliott. We believe that a fair summary of their testimony relating to the Hooper Survey is as follows:

That for many years Jones' wife owned an 84-acre tract in the northeast corner of the Hooper Survey; that Jones moved on it in 1902; that D. A. Culpepper, his father-in-law, pointed out the northeast corner of the tract to Jones in 1901, at the time he gave the tract to Mrs. Jones; that it was pointed out to him as being the northeast corner of the Hooper Survey; that in 1894 or 1895, during the time the timber was being cut out, Jones saw a stump of very large pine north 50 east 2 varas from an old pine knot in the ground; that this was the corner pointed out to him by Culpepper, and that Jones later built a fence south from this point and that it constituted the east line of his land; that at about the same time he and another surveyor surveyed along this line where the fence was built and found a marked line; that he also owned a tract of 98 acres immediately south of the 84-acre tract, and that he extended the east fence of the 84-acre tract down the east side of the 98-acre tract; that in 1929 he made a search for the trees called to witness the northwest corner of the Robinson and found a blackjack tree standing at the proper course and distance from the point he now contends is the northwest corner of the Robinson; and that from this data Jones placed the east line of the Hooper something over 50 varas east of where Garrett and the court found it to be. That Beavers located the southeast and northeast corners of the Castleberry from old stumps and remains of stumps; and that he had located the northwest corner of the Robinson, in 1932, from the remains of an old blackjack tree. That Beavers, on a recent survey, found the root system of the other witness tree at his northwest corner of the Robinson. That Elliott commenced his survey of the Hooper at the northwest corner of the Robinson. That Jones, Beavers and Elliott all agreed as to the location of the northwest corner of the Robinson. That they all established their southeast corner of the Hooper at 520 varas south of their northwest corner of the Robinson, but did not find anything on the ground there. That Elliott found a fence running east from his northwest corner of the Robinson, which he thought was the line between the Sanches and the Robinson. That Jones and Elliott established the west line of the Hooper, by course and distance, at 4810 varas west of what they thought to be the east line, but could not find any evidence of a corner at either the northwest or the southwest corner. That the west line of the Hooper as established by them did not encounter any fence or fence corner, but was considerably east of the line of occupation. That for some reason not made clear in their testimony they extended the west line of the Hooper south 4821 varas, instead of 4800 varas, the distance set out in the field notes. That they found the west line of the Hooper to be along the east line of the alleged vacancy.

With respect to appellants' attack upon Garrett's testimony relating to the tree roots, stumps, and the like, we observe that appellants' surveyor Jones relied upon a stump he had seen at the northeast corner of the Hooper, and the remains of an old blackjack tree he had seen at the northwest corner of the Robinson. That Beavers relied upon the remains of stumps, some of which were buried, at the southeast and northeast corners of the Castleberry, and the northwest corner of the Robinson. That Elliott relied upon root systems at the northwest corner of the Robinson, hunted for stump holes at the southeast corner of the Hooper, and relied upon a tree lying on the ground at the beginning point of the Ferguson. It ap-

pears that the surveyors on both sides used this method in searching for the old corners.

And reference may here be made to the rules of evidence in this class of cases.

For upwards of a hundred years it had been thought that the Ferguson and Hooper Surveys adjoined. The Rankin called to adjoin the Hooper, and the Hooper called to adjoin the Rankin. The Ferguson had been surveyed three times, and each of the surveyors recited in his notes that he had connected with the Hooper. All of the maps in the General Land Office had shown the two surveys to adjoin. In 1911, when efforts were being made to obtain a patent to the Ferguson, the Land Commissioner gave instructions to take care to connect with all of the adjoining surveys, all of which had been patented long before. The field notes of the Ferguson, and the description in the patent, called for adjoinder with every surrounding survey. There had always been a joint line of occupation between the lands in the Ferguson and the lands in the Hooper.

Appellants used this language in their brief, referring to a survey made by Jones: "In 1929, before visions of oil had changed these old land lines."

■ Titles to land are not to fail merely because old markers may have disappeared, or because it may be difficult to trace the footsteps of the surveyor.

■ The lengthiest discussion of the rules of evidence applicable in cases like this one is found in Taylor v. Higgins Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288, 300, writ dismissed. In this case the rule is stated to be: " 'Every rule of evidence laid down for guidance in boundary questions is for the purpose of ascertaining the true location of the line in dispute, by which is meant the place at which the original surveyor ran the line. After 90 years have elapsed and time has destroyed in large measure the evidence left by the original locater, it is then permissible, not only permissible, but of necessity is required, that we resort to any evidence tending to establish the place of the original footsteps which meets the requirement that it is the best evidence of which the case is susceptible.' "

■ In the case on appeal, all of the surveyors on both sides, in their efforts to find where the original surveyors actually went, searched for tree roots, buried stumps, stumps that were not buried, trees lying on the ground, stump holes, old fence lines and corners, creeks and old abandoned roads, and markings on trees made a hundred years ago; and all of them studied the field notes of surrounding surveys as well as corners and lines of surrounding surveys on the ground. And, in turn, they all testified concerning these matters. We find nothing from the testimony of appellants' surveyors, or from any other circumstance in the case, to warrant the criticism so made of Garrett's testimony. In short, the surveyors on both sides offered their testimony. The trial court saw and heard them, and found as he did. All we can see in the case is a conflict of testimony, the weighing of which was left to the trial court.

■ In all of the cases, from Stafford v. King, 30 Tex. 257, 94 Am.Dec. 304, on down, the law has been that search must be made for the footsteps of the surveyor, and that, when found, the case is solved.

All of the surveyors testifying in the case located the east line of the Ferguson at points east of what the court found to be the west line of the Hooper. So, if the trial court was justified in locating the west line of the Hooper as he did, there would be an overlap, and consequently no vacancy.

The old Rankin Survey, as we have pointed out, was abandoned. The David Ferguson was first surveyed in 1849, by Thos. D. Brooks. This survey was not approved by the Land Office. Subsequently, J. M. Glasco, County Surveyor, sent to the Land Office his corrections of the Brooks notes, but they were not approved. Finally, in 1911, W. C. Elms, County Surveyor of Upshur County, made a survey of the Ferguson which was approved by the Land Office, and upon which the patent was issued.

Although it is not material to our holding, it is of some interest to note from the evidence that Elms was County Surveyor of Upshur County at the time of this trial, and appears to have been available as a witness, but was not used by either side.

■ The Brooks, Glasco and Elms field notes all call for the most eastern northeast corner of the Ferguson to be at the northwest corner of the Hooper, and to run south along the Hooper west line. But the decisions of our courts pertaining

to calls for adjoinder are not helpful to us here, because the surveyors on both sides offered testimony which, if correct, showed that the various surveyors of the Ferguson were mistaken in calling for the adjoinder. And, as the courts have held, if the footsteps of the surveyor are located on the ground, the call for adjoinder, like any other conflicting call, must yield. Although appellees contend that the presumptions arising from the call for adjoinder are alone sufficient to sustain the judgment of the trial court, we do not reach our holding on that basis. Our holding is based upon the opinion that there was sufficient evidence, if believed by the trial court, to warrant his findings and judgment.

All of the surveyors were substantially in agreement as to all of the calls of the Ferguson up to and including its most northern northeast corner. There was some disagreement between them as to the location of the ell corner at or near the southwest corner of the J. R. Wadkins Survey, but the location of that corner is not controlling, as we shall show.

The call in the field notes from this last-mentioned corner, to the most eastern northeast corner, is, "Thence east with the south line of the Wadkins and Wm. King at 2008 vrs. the N. W. corner of a survey in the name of G. W. Hooper", and then calling for a hickory tree and a blackjack stump hole. These were the witness trees called for in the Brooks notes, but were not the witness trees called for at the northwest corner of the Hooper in the Hooper notes.

The surveyors on both sides contended that this call for distance was erroneous. Garrett contended that the correct distance was 1989.73 varas. Appellants' surveyors contended that the distance was 1994 varas. So it may be said, we believe, that the material evidence as to this corner was reduced largely to testimony relating to the objects found on the ground.

Garrett's testimony, in substance, was:

That he located his southwest corner of the Wadkins, and this ell corner of the Ferguson, with reference to the TNC tree mentioned earlier in this opinion, and from the root system of another tree of the kind and at the course and distance called for in the Woodfin and Wadkins notes. That at 2008 varas east of this point he found nothing on the ground. That at 1991.4 varas he found an old pine knot. That he found a hickory stump hole. That by

reversing the field note call, from this stump hole, he established what he set up, and what the trial court found, as the most eastern northeast corner of the Ferguson Survey. That at the course and distance where the field notes called for a blackjack tree, from the position he had set up as the northeast corner of the Ferguson, he found the vertical roots of what he took to be a blackjack tree. That he thus placed his northeast corner of the Ferguson at about 1.75 varas west of the pine knot he had found.

This point was 28.2 varas east of the west line of the Hooper, as set up by Garrett on his map and as found by the trial court. In other words, the trial court found an overlap of 28.2 varas at this corner. The Hooper being the senior survey, he adjudged the east line of the Ferguson to be a common line with the west line of the Hooper.

Garrett testified that, surveying south along what he had established on his map as the east line of the Ferguson, he found, at 137.4 varas south, a marked tree 2 varas east of his line, and at 350 varas, another marked tree 2 varas east of his line. He took blocks from these two trees; they were introduced in evidence; and Garrett testified that from the rings of the trees it appeared that the marks were made in 1911, the year Elms surveyed the Ferguson.

Garrett testified that the line of occupation ran south from the point he had established on his map as the northeast corner of the Ferguson Survey.

From the evidence it appears that the Ferguson Survey was cut up into blocks before the Hooper was; that the landowners in the east part of the Ferguson built fences along a line which for the most part runs south of the corner which the court found to be the northeast corner of the Ferguson; and that when the Hooper was later cut up into blocks, the owners in the Hooper occupied up to the fence lines which had been established by the Ferguson owners. We regard this as a circumstance which, to say the least, is consistent with the findings of the trial court.

Another circumstance consistent with the findings of the trial court is this: It will be remembered that the fourth call in the Hathaway is 440 varas. The notes of all the Ferguson surveys, going south past the southwest corner of the Hooper, call to go west 460 varas, thence south to the

place of beginning, a call 20 varas longer than the call in the Hathaway. Garrett testified that the most eastern southeast corner of the Ferguson, as established by him, would be about 461 or 462 varas east of a line projected north from the beginning point of the Ferguson. In other words, a reversal of the last two calls in the Ferguson field notes would correspond, within a vara or two, with Garrett's survey. And the difference between the Hathaway call of 440 varas and the Ferguson call of 460 varas is consistent with the theory of an overlapping of the Ferguson and Hooper.

Garrett testified that he made a search for evidence of witness trees at the point established by appellants' surveyors as the northeast corner of the Ferguson, but could find nothing.

We believe that the following is a fair summary of the testimony offered by appellants to support their theories as to the location of the northeast corner of the Ferguson:

A landowner, H. Fenton, testified that he was present when Elms, or one of his assistants, drove a stake, in 1911, and that Elms told him that it was located as the northeast corner of the Ferguson Survey; that Fenton pointed out this stake, a pine knot, to the surveyor Jones several years before the trial. Jones testified that Fenton had pointed out this stake to him, and that it was at the point established by Jones as the northeast corner of the Ferguson Survey. Why appellants did not produce Elms as a witness to support this theory is not disclosed in the record. Fenton also testified that formerly a hickory tree stood four or five steps to the northwest of the stake driven by Elms. Jones said that he had made several surveys around this point several years before the trial, and that a hickory stump had stood 80 west 5.4 varas from the stake claimed to have been driven by Elms. Elliott also testified to having seen this same stake and hickory stump, but admitted, on cross-examination, that in surveys made by him before this controversy arose, he had taken the line of occupation which ran south of Garrett's northeast corner of the Ferguson as being the east line of the Ferguson and the west line of the Hooper.

The east line of the Ferguson as established by appellants' surveyors coincided with the west line of the alleged vacancy, but was west of the line of occupation.

As appellants put it in their brief:

"We are not bothered with the comparative dignity of calls, whether or not one call, as such, ought to prevail over some other call. But we are trying here to 'find the footsteps of the surveyor' * * *."

Appellants contend that Garrett's testimony must not be considered because, they claim, his calls, in his reconstruction of the Ferguson, do not close. While this may have had some bearing on his credibility, we do not consider that it is controlling on this appeal. In the first place, all of the surveyors placed the east line of the Ferguson east of the west line of the Hooper, as located by the court. In the second place, the controlling question was the location of the east line of the Ferguson. Particularly since all of the surveyors agreed that Elms' notes were inaccurate, as to distance, in the call leading to the northeast corner, the other calls of the Ferguson Survey were not of controlling importance.

It seems to us that there is at least as much evidence to support Garrett's location of the Ferguson as there is to support the location claimed by appellants. It being within the trial court's province to resolve this conflict of testimony, we are without authority to substitute our opinions for his, even if we were disposed to do so.

Also, we are of opinion that the record, as a whole, reflects that the work of the surveyor Garrett was more thorough, more painstaking, more accurate, and more in harmony with the rules of law pertaining to cases of this kind, than was that of the surveyors who testified for appellants. It appears to us that he made more careful search for objects on the ground. He not only searched for evidence of witness trees at the corners he established, but also at the corners established by appellants' surveyors.

Another circumstance which, to our minds, detracts from appellants' argument that the Hooper must be built exactly upon course and distance from what they contend is the east line, is the fact that many of the lines of these and the other surveys in the same area are shown to be, on the ground, either longer or shorter than the lines called for in the field notes. Also, while appellants' east line of the Hooper appears to correspond with the line of occupation along the north end of the line, Garrett's east line corresponds more nearly

with the line of occupation along the south end of the line. Neither the east line of the Ferguson nor the west line of the Hooper, as established by appellants' surveyors, corresponds with the line of occupation in that area.

█ Appellants contend that the landowners, by virtue of having made application to purchase vacant land adjoining their land, have admitted the fact of the vacancy. The record reflects that the landowners were approached by other persons, who represented to them that they ought to make these applications to protect their interests. In the first place, we do not think that land could be conveyed in this fashion; and in the second place, we think the landowners offered sufficient explanation to relieve themselves of any such admissions. Their applications were rejected, and we think are immaterial on this appeal.

Appellants contend that, the suits being in trespass to try title, the landowners failed to make sufficient proof of their title from the sovereignty of the soil, and failed to make sufficient proof of limitation title because of failure to locate definitely the land which had been in their possession.

This suit was really one of boundary. Although it has been customary to bring boundary suits in the form of trespass to try title, the courts have long recognized the distinction between suits relating to the title, and suits relating to boundary. In fact, for a long time the distinction was even recognized in the rules which gave the Courts of Civil Appeals final jurisdiction in the boundary cases.

The landowners specially pleaded the defendant's claim of the vacancy, and his claim of mineral rights to the alleged vacancy. Turnbow also pleaded his mineral grants, and in his application for receiver recognized the plaintiffs as the owners of the lands adjoining the alleged vacancy, referring to "their lands".

It is most apparent, from the whole record, that Turnbow bases his whole claim on the contention that there is a vacancy between the two surveys, and we certainly do not believe that the State is purposely claiming in this suit any land lying in either the Ferguson or the Hooper Survey.

If there is no vacancy, the position of appellants can be no better than that of trespassers. We consider that the record is entirely sufficient to show not only that plaintiffs were in possession, which would entitle them to maintain the suit as against a trespasser, but also that their possession was of a character sufficient to establish title by limitation, if there is in fact no vacancy. Appellants were clearly not claiming any land lying in either of these two surveys, but only the land lying in the vacancy, if there was a vacancy.

All assignments of error are overruled.

The judgment of the trial court is affirmed.

## On Motion for Rehearing.

We have carefully reviewed the assignments presented in appellants' motion for rehearing. None of them raises any new questions, and we would not enlarge upon our original opinion were it not apparent that appellants have a misconception of our opinion in some respects.

The 70th assignment recites that we hold that this is only a boundary suit. Our opinion follows the language of several Supreme Court decisions in saying that the suit is in the form of trespass to try title, but that it is principally one of boundary. It cannot be disputed that the location of the east boundary line of the Ferguson Survey and the west line of the Hooper Survey determine whether or not there is a vacancy between the two surveys. Our problem is to determine whether there is a vacancy.

The 75th assignment reflects a misconstruction of our holding. Our opinion is clear in pointing out, not that the Hathaway notes control the location of the Hooper, but that the distances called for in the Hathaway notes are consistent with the distances in the Hooper lines as found by the trial court. The consistency of the Hathaway calls with the Hooper calls, as found by the trial court, supports such findings.

The same kind of misconception is found in the 80th and 81st assignments. Our holding is not based upon a theory of adjoinder of the two surveys.

The 82nd assignment recites that we held that there had "always" been a common line of occupation between the two surveys. Our opinion states our actual holding.

As to the 87th assignment, our opinion shows that our holding is not based upon Elms' failure to testify.

█ The 88th assignment relates to the claim of appellants that Garrett's field notes of the Ferguson Survey do not close. Our actual holding on this is plainly set

out in the opinion. It is that the matter may have some bearing upon Garrett's credibility as an expert witness, but that it is not controlling upon this appeal because the location of the east line of the Ferguson, with reference to the west line of the Hooper, determines whether there is a vacancy. The location of the other lines and corners of the Ferguson is not necessarily controlling; and, it may be pointed out, the findings and judgment in this cause are binding only upon the parties, and not upon owners of lands along the other lines of the survey.

In our opinion, the more specific, definite and reasonable evidence supports the judgment and findings of the trial court.

The motion for rehearing is overruled.

BROWN and SPEER, Justices (concurring).

Because of the lengthy and strenuous motion for a rehearing that has been filed and carefully considered by us, the writers deem it necessary to make a few observations tersely touching the gist of the suit before us.

In the first place, regardless of the form of the pleadings, the evidence discloses that this is nothing more than a boundary suit. That is the sum and substance of the contention.

Appellants are contending that there is a strip of vacant land between the Ferguson and the Hooper Surveys. That is to say, that, when the footsteps of the surveyors are traced and established, the east boundary line of the Ferguson Survey does not meet the west boundary line of the Hooper Survey, and that the land in controversy is a narrow strip thus left unsurveyed.

We held, in the original opinion, that the testimony and evidence tending to show that there is no vacancy is more certain and more credible than the testimony and evidence adduced by the appellants tending to show there is a vacancy. We likewise held that on such conflicting testimony and evidence the trial court's judgment should not be disturbed. Our holding is that the evidence is sufficient to support the judgment rendered by the trial court.

We heartily concur in the holdings expressed by Chief Justice McDONALD in the original opinion and in the conclusions reached in overruling the motion for a rehearing.