**TEAL et al.**

v.

**POWELL LUMBER CO.**

No. 4860.

Court of Civil Appeals of Texas.

Beaumont.

Oct. 15, 1953.

Rehearing Denied Nov. 12, 1953.

John Ben Shepperd, Atty. Gen., and Price Daniel, former Atty. Gen., John Blair, Mildred Building, Beaumont, Vinson, Elkins, Weems & Searles, Houston, for appellants.

E. L. Reid and Clyde McKee, Orange, for appellee.

ANDERSON, Justice.

This is a boundary case, the question for determination being whether a particular 62.3 acres of land lies within or without the bounds of the David S. Suddeth Survey in Orange County.

Application to purchase the land as unsurveyed school land having been made by F. M. Teal under the provisions of art. 5421c, Rev.Civ.Stat., Vernon's Ann.Civ.St., the Commissioner of the General Land Office found it to be vacant and unsurveyed school land, bounded on the east by the Suddeth survey, on the west by the Harvey Vanway survey, on the north by the Charles Morgan survey, and on the south by the John Allen survey, and approved the Teal application to purchase.

This suit was instituted in the district court of Orange County by appellee, Powell Lumber Company, pursuant to the provisions of the aforesaid Act, to try the issues of boundary, of title to and ownership of the land, and of whether appellee was a good faith claimant of the land, with preferred rights regarding it, if it should be found to be vacant and unsurveyed school land. The Commissioner of the General Land Office of Texas, the Attorney General of Texas, and F. M. Teal, and Progress Petroleum Company were named as defendants. Progress Petroleum Company, the holder under Powell Lumber Company of a mineral lease on the Vanway survey and a part of the Suddeth survey, made common cause with the plaintiff upon the trial of the case.

The trial, which was before the court without a jury, resulted in a judgment for the plaintiff. The land in controversy was decreed to be a part of the David S. Suddeth survey, and Powell Lumber Company was adjudged its owner, subject to the mineral lease of Progress Petroleum Company. The Commissioner of the General Land Office and the Attorney General have appealed.

The appellants predicate their appeal on only two points of error. The effect of these points is to challenge the correctness of the trial court's judgment on the evidence which that court had before it.

No findings of fact or conclusions of law were either requested or filed. We must therefore proceed upon the theory that the trial court resolved every disputed fact issue in favor of appellee, and must sustain the trial court's judgment if the evidence, when construed most favorably to it, supports it under any reasonable theory authorized by law and the pleadings. North East Texas Motor Lines v. Dickson, 148 Tex. 35, 219 S.W.2d 795, 11 A.L.R.2d 1065; Construction & General Labor Union v. Stephenson, 148 Tex. 434, 225 S.W.2d 958; Williams v. Ritcheson, Tex.Civ. App., 212 S.W.2d 813, error refused.

The following plat, which is not drawn to scale, will serve to illustrate the evidence. The shaded area represents the land in controversy.

| J. S. Norris | Jefferson Robinson | E. F. Farr | Harry Vanway | | David S. Suddeth | A. Pre- Jean | F. Y. C. Guthrie | Wm. G. Wright | Wm. Morgan | Jacob Townsend |
|---|---|---|---|---|---|---|---|---|---|---|

Charles Morgan League

John Allen League

SABINE RIVER

Appellee, Powell Lumber Company, owns the Vanway survey and all of the Suddeth survey except 60 acres in its northeast corner, subject to the mineral lease that is held by Progress Petroleum Company. The Vanway survey is junior to the Suddeth survey, and its field notes call for it to begin at the northwest corner of the Suddeth survey, and for it then to run west, south east to the Suddeth southwest corner, and north with the Suddeth west boundary to the place of beginning. In other words, the field notes of the Vanway survey call for that survey to adjoin the Suddeth survey, and for the east boundary of the Vanway survey and the west boundary of the Suddeth survey to be the same or a common boundary.

The Vanway survey's east boundary, the parties agree, is marked on the ground and can be identified by its original monuments; but the Suddeth survey's west boundary cannot be located on the ground with certainty by any of its original monuments, and its true location on the ground is the matter in issue.

The appellee contends, of course, that the west line of the Suddeth survey is the same as the established east line of the Vanway survey, and that the land in controversy is therefore a part of the Suddeth survey. The appellants contend, on the other hand, that the true location on the ground of the west line of the Suddeth survey is almost 400 varas east of the established east line of the Vanway survey, and that the vacancy contended for exists between the two surveys.

Appellants first contend that, when considered in connection with the survey's course and distance calls, certain objects which are to be found identify the boundaries of the Suddeth survey on the ground, and fix the survey's west boundary where appellants would have it located. By this means, appellants would place the survey's northwest corner 399.2 varas east of the established northeast corner of the Vanway survey, and its southwest corner 373 varas east of the established southeast corner of the Vanway survey, leaving a vacancy of 62.3 acres between the two surveys. Appellants next contend that if the objects which exist on the ground and on which they in part rely to identify the Suddeth survey are not deserving of consideration or are not sufficient for that purpose, then the survey must be constructed by its course and distance calls from call-points lying to the east of it.

If either contention is correct, and if the survey on which appellants rely (presumably the same one on which the Commissioner of the General Land Office relied when he declared the vacancy) was conducted from or tied to the correct call-points, the vacancy, or a larger one, no doubt exists as appellants contend it does.

To refute the existence of the vacancy and to sustain the judgment of the trial court, appellee relies primarily upon the calls for adjoinder contained in the field notes of the Vanway survey, and upon the premise that the burden of proving the existence of the vacancy, and that the call for adjoinder contained in the Vanway field notes resulted from mistake rested upon appellants, and that appellants failed to meet or discharge that burden of proof.

■ The case was tried by all parties upon the theory that originally both the Suddeth survey and the Vanway survey were actually surveyed on the ground. The evidence leaves no doubt as to the correctness of this theory, but in any event, in the absence of evidence to show the contrary, we should have to presume that the surveys were actually made on the ground. Boon v. Hunter, 62 Tex. 582; Maddox v. Fenner, 79 Tex. 279, 291, 15 S.W. 237; Anderson v. Schaefer, Tex.Civ.App., 275 S.W. 300. Certain well established principles of law that serve to define and circumscribe the questions before us for determination are therefore applicable.

■ One of these is the rule that if the footsteps of the original surveyor can be identified and followed, they will control the location of the line or boundary in question even though they may not be in harmony with the field note calls. This rule is

stated in the case of Miller v. Meyer, Tex. Civ.App., 190 S.W. 247, 250, as follows: "The real object in applying the various calls is to find the footsteps of the surveyor. When these are found and identified, all classes of calls must yield to them. Fulton v. Frandolig, 63 Tex. 330; Converse v. Langshaw, 81 Tex. 275, 16 S.W. 1031; Ruling Case Law, vol. 4, § 56, p. 117." The same rule is thus stated in the case of Turnbow v. Bland, Tex.Civ.App., 149 S.W.2d 604, 611, writ of error dismissed: "In all of the cases, from Stafford v. King, 30 Tex. 257, 94 Am.Dec. 304, on down, the law has been that search must be made for the footsteps of the surveyor, and that, when found, the case is solved."

■ Another of the well established principles to which we referred is the rule that the boundaries of a senior survey cannot be extended or varied to satisfy the calls of a junior survey. State v. Franks, Tex.Civ.App., 113 S.W.2d 589, 596, error refused; Garcia v. State, Tex.Civ.App., 274 S.W. 319.

The footsteps of the surveyor who originally surveyed the Vanway survey have been found and identified. There is, therefore, no elasticity in that survey. In other words, since its east boundary can be identified on the ground, the Vanway survey cannot be extended east of that line for the purpose of satisfying its calls for adjoinder with the Suddeth survey. The west boundary of the Suddeth survey, wherever the footsteps of the surveyor may have placed it, is just as immobile. Irrespective of the legal means by which its true position on the ground may be determined, it cannot be varied or moved west for the purpose of satisfying the calls for adjoinder contained in the field notes of the Vanway survey, the Vanway survey being junior, as aforesaid, to the Suddeth survey.

The problem with which we are confronted, therefore, is not the one most frequently presented by cases of this kind: that of whether a call for adjoinder with another survey is to be given precedence over course and distance calls that conflict with it. It is, rather, the problem of what probative weight or effect is to be given the calls for adjoinder contained in the field notes of the junior survey (the Vanway) when they are considered solely as evidentiary matter bearing upon the location and identification of the footsteps of the surveyor who originally surveyed the senior survey (the Suddeth).

Upon the theory that, since he called for the Vanway survey to adjoin the Suddeth survey, and for the Vanway east line to be a common line with the Suddeth west line, the surveyor who originally surveyed the Vanway survey must be presumed to have surveyed the west line of the Suddeth survey and to have found and to have known where it was situated upon the ground, appellee contends that, in the state of the record, the adjoinder calls in the Vanway field notes should be given controlling effect and should be held to establish the Suddeth west line along the Vanway east line. Appellants contend, on the other hand, that the evidence shows circumstantially that the calls in the Vanway field notes for adjoinder of the two surveys were made through mistake, and that, in the state of the record, other rules for the construction of grants are applicable and require a different result. It is necessary, therefore, that the evidence be reviewed in the light of the conflicting contentions of the parties.

The David S. Suddeth survey was surveyed by W. G. Morgan in 1871, and was patented in 1884. The Harvey Vanway survey was patented in 1901. The record does not disclose when or by whom it was surveyed. Both surveys, as well as the surveys lying east and west of them, were constructed between two senior league surveys, the John Allen League on the south and the Charles Morgan league on the north. Both the north boundary of the Allen league and the south boundary of the Morgan league are called by the field notes of those surveys to run east and west, and there seems to be no dispute between the parties about the fact that, as surveyed on the ground, the two lines are separated by a distance of 999 varas.

At the time the David S. Suddeth survey was surveyed in 1871, only two other surveys had been either surveyed or patented between the Allen and Morgan leagues. The Jacob Townsend survey had been surveyed in 1838 and patented in 1841, and the F. Y. C. Guthrie survey had been surveyed in 1856 and patented in 1862.

The field notes of the Suddeth survey call for it to begin on Charles Morgan's south line, 400 varas west of the F. Y. C. Guthrie survey, and for it then to run south 999 varas, west 904 varas, north 999 varas, and east 904 varas to the place of beginning.

The surveyor's field notes that were introduced in evidence for the F. Y. C. Guthrie survey call for it to begin on the north line of the John Allen league, 3,765 varas west of the Allen northeast corner and 1,682 varas from the southwest corner of the Jacob Townsend survey, and for it then to run west with the Allen line 904 varas, north 999 varas to the south line of the Charles Morgan survey, east with the Morgan line 904 varas, and south 999 varas to the place of beginning. The patented field notes are the same except that they call to begin 3,865 varas, instead of 3,765 varas, west of the northeast corner of the Allen league, and omit any reference to the Jacob Townsend survey.

Two sets of field notes, one of them a translated copy, were introduced in evidence for the John Allen league survey. They appear to have been made by different surveyors, but at or about the same time. They were either signed by the surveyors or else filed—just which is not entirely clear from the record—on successive days. Both sets of field notes call for the survey to begin at a cypress at the northeast corner of Richard Beleu's sitio or survey, "on the waters" of the Sabine river. One set of the notes calls for the survey then to run west, while the other set calls for it to run south 89 deg. 20' west, to the second corner, a distance of 10,120 varas. From this second or southwest corner, both sets of notes call to run north 2,631 varas to the third or northwest corner, and then

east 9,535 varas to the fourth or northeast corner of the survey. The calls contained in the translated copy of the field notes for the north line, the northeast corner, and the east line of the survey, proceeding from the survey's northwest corner are: "Thence East 9,535 to a maple for the fourth corner on the West bank of Sabine river from whence a gum 30 inches in diameter bears South 7 degrees East at $12\frac{4}{11}$ varas distance, thence down the survey of the land you directed me to have surveyed." The northeast corner of the survey is thus described in the other set of field notes: "To a maple for 4th corner, from which a gum 30 in. brs. S 7 E $12\frac{4}{10}$ vrs. dist. Also red oak 10 in. dmt. brs. N 50 W $9\frac{4}{10}$ vrs. dist." From such point, the last-mentioned field notes call to run, "Thence down the River," and they then set out the meander calls to the beginning or southeast corner of the survey.

The patented field notes of the Jacob Townsend survey, as well as the surveyor's notes, call for it to begin "at a stake on the River from which a Sweet Gum marked JA bears South $13\frac{1}{10}$ varas and a Water Oak marked X bears north 80 deg. West $10\frac{2}{10}$ varas," and for it then to run "up the river," north 1 degree west, 1,000 varas to the southeast corner of the Charles Morgan survey, west with the south boundary of the Morgan survey 2,083.3 varas, south 999 varas to the John Allen north line, and east with the Allen north line to the place of beginning.

Reverting to the field notes of the Harvey Vanway survey: they call for it to begin at the northwest corner of the Suddeth survey, in the south line of the Charles Morgan league, and for it then to run west 900 varas with the south line of the Charles Morgan league to the northeast corner of the Jefferson Robinson pre-emption survey, south 999 varas to the southeast corner of the Jefferson Robinson survey and the north line of the John Allen survey, east 900 varas with the north line of the Allen league to the southwest corner of the Suddeth survey, and north 999 varas with the west line of the Suddeth survey to the place of beginning.

We shall have occasion to mention the field notes of at least one other survey during the course of the opinion, but it is not necessary to set them out in detail at this point.

Except at the northwest corner of the David S. Suddeth survey, where only a post is called for, either a corner-tree or corner-witness-trees, or both a corner-tree and corner-witness-trees, are called for at all corners which we shall have occasion to mention or discuss. Mention will be made of these trees as the occasion demands, but, for reasons which will appear during the course of the opinion, it is not necessary to mention all of them or to describe them in detail.

We do mention here, however, that none of the witness-trees called for at the southeast corner of the Harvey Vanway survey correspond to the witness trees called for at the southwest corner of the David S. Suddeth survey. A black gum, 10 inches in diameter, is called to bear north 20 degrees west 4 varas, and an ash, 8 inches in diameter, is called to bear north 55 degrees west 5 varas from the southwest corner of the Suddeth survey, while a black gum (not otherwise described) is called to bear north 45 degrees east 5 varas from the southeast corner of the Vanway survey. Also, a black gum, 12 inches in diameter, is called to bear north 2 degrees 30 minutes east 4 varas, and a pine, 16 inches in diameter is called to bear south 36 degrees 30 minutes west 3⁹⁄₁₀ varas from the northeast corner of the Vanway survey, whereas no witness trees are called for at the northwest corner of the Suddeth survey.

Although the field notes of the Vanway survey call for it to adjoin the Jefferson Robinson survey, which lies west of it, and for the west boundary of the Vanway survey to be a common boundary with the east boundary of the Robinson survey, the two surveys do not, in fact, adjoin each other. They are separated by what is now the Farr survey.

In this connection, the plaintiff (appellee) introduced in evidence a letter from the Commissioner of the General Land Office to E. T. Farr, dated March 21, 1902, in which it is stated that the county surveyor and his deputy had made surveys showing the J. Robinson survey in two positions: one survey showing it to adjoin the Harvey Vanway survey and to be separated from the J. S. Norris survey by what is now the Farr survey, the other showing it to adjoin the J. S. Norris survey and to be separated from the Harvey Vanway survey by what is now the Farr survey. The Commissioner called for a certified plat, together with supporting data, showing the position of the Robinson survey on the ground relative to the Vanway and Norris surveys. Plaintiff also introduced in evidence a plat from the files of the General Land Office which depicts the Robinson survey as adjoining the Norris survey on the west and as being separated from the Vanway survey by the Farr survey. This was presumably the plat that, by being in conflict with a previous survey, provoked the letter just mentioned, because it was made by the county surveyor of Orange County, and, according to a statement made by counsel in connection with its introduction in evidence, was made during the year 1901.

The plat also showed the Vanway and Suddeth surveys as adjoining each other, but the surveyor only certified that it was a true and correct plat of the Robinson, Farr, and Vanway surveys.

Both the Suddeth survey and the Vanway survey were patented under and by authority of an Act of the Legislature approved May 26, 1873, entitled, "An Act for the Benefit of Actual Occupants of the Public Lands." The field notes of the respective surveys call for the Suddeth survey to contain 160 acres and for the Vanway survey to contain 159.14 acres.

Guy A. Stonecipher, a state-licensed-land surveyor, who, presumably, was the surveyor appointed by the Commissoner of the General Land Office to make the survey required by art. 5421c after the application to purchase was made, was called as a witness by the defendants, and was the only surveyor who testified upon the trial.

He did not survey either the John Allen league or the Charles Morgan league for the purpose of locating their respective north and south lines, but the parties to the suit seem to be agreed that the lines which he used as those lines were in fact they, and the lines will therefore be referred to as such.

He surveyed the entire length of the north line of the John Allen league; surveyed the south line of the Charles Morgan league from the river to what he took to be the northwest corner of the J. S. Norris survey; and undertook to survey and locate all of the boundaries of all surveys lying between the Allen and Morgan leagues, from the river to and including the Jefferson Robinson survey. His measurements and findings and lack of findings from the Farr survey east, however, are the only things that are material and are the only ones of which note will be taken.

He was of the opinion he found original monuments at the points which he adopted as the following corners, and only at those points: (1) The southeast corner of the Jacob Townsend survey (assumed by the surveyor to be also the northeast corner of the Allen league), (2) the southeast corner of the Harvey Vanway survey, (3) the northeast corner of the Jacob Townsend survey (which is called to be the same as the southeast corner of the Morgan league), (4) the northwest corner of the F. Y. C. Guthrie survey, (5) the northeast corner of the David S. Suddeth survey, (6) the northeast corner of the Harvey Vanway survey, and (7) the northwest corner of the Harvey Vanway survey. He also testified that he found evidence of old land lines running south from the corners he adopted as the northwest corner of the Guthrie survey, the northeast and northwest corners of the Suddeth survey, and the northeast and northwest corners of the Vanway survey. He did not purport to know by whom any of the tree-markings on which he relied as originals had been made, but expressed the opinion that they were all of sufficient age to have been made by the original surveyors.

At the place which he adopted as the correct location for the northeast corner of the Suddeth survey, Stonecipher found an iron stake (placed within recent years), witnessed by a white oak, 12 inches in diameter and bearing the very old markings of a corner-witness-tree, that stood west 4 varas from it (the same course and distance a white oak, 12 inches in diameter, was called to bear from the northeast corner of the Suddeth survey). Having concluded that the white oak was the original witness tree called for at the northeast corner of the Suddeth survey, he gave it precedence over the distance call for that corner, and located the corner 18 varas east of where the distance call would have placed it. In other words, he placed the corner only 382 varas, instead of 400 varas, west of what he had concluded was the northwest corner of the F. Y. C. Guthrie survey. Had he gone west from the latter point the full 400 varas, he would have arrived in a public highway that had been constructed within recent years.

In adopting as the northwest corner of the Suddeth survey the location which he did (the same location the Commissioner of the General Land Office adopted when he declared the vacancy), Stonecipher again gave marked trees precedence over the distance call. Having failed to find any evidence of either a corner or a line running south when he had surveyed west 904 varas (the called-distance for the Suddeth north line) from the corner he had adopted as the Suddeth northeast corner, he continued west an additional 28 varas, or an overall distance of 932 varas from the corner he had adopted as the northeast corner of the survey, to where he intersected what he concluded was a marked line running south. The location fell in an old slough that had been drained.

The evidence on which he relied of a line running south from that point to the north line of the Allen league consisted of old hack marks on two trees, one of which trees was situated about 50 varas south of the south line of the Morgan league, and the other of which was situated about 300

varas north of the north line of the Allen league.

At the place which he adopted as the northwest corner of the F. Y. C. Guthrie survey (the survey off which the Suddeth survey was constructed), Stonecipher found an iron stake (placed within recent years), witnessed by what he concluded was an original witness tree called for at that corner. A Tupelo Gum, 30 inches in diameter and bearing the very old markings of a corner-witness-tree, bore south 56 degrees east 4⅘ varas from the stake (this being the same course and distance a Tupelo Gum —not otherwise described—was called to bear from the northwest corner of the Guthrie survey).

In arriving at this stake or corner, Stonecipher had commenced his survey at an iron stake (placed within recent years) which he had found in the north line of the John Allen league, 13 varas west of the west bank of the Sabine River, and which he had concluded was both the northeast corner of the Allen league and the southeast corner of the Jacob Townsend survey. From this beginning point, he surveyed west along the Allen north line 3,865 varas (the distance the patent called for the Guthrie survey to commence west of the Allen northeast corner), adopted the point at which he arrived as the southeast corner of the Guthrie survey, and then continued west an additional 904 varas (the called distance for the Guthrie south line) and adopted the point at which he arrived as the Guthrie southwest corner. From this latter point or corner he surveyed north, along what he described as a marked line, 999 varas (the called distance for the Guthrie west line), at which distance he arrived at the south line of the Morgan league and the iron stake which was witnessed by the Tupelo Gum.

The southeast corner of the Guthrie survey, as arrived at in the manner above detailed, was found to be also 1,682 varas (the called distance) west of the southwest corner of the Jacob Townsend survey, as the latter corner was located on the ground by course and distance calls from the estab-lished northeast corner of the Townsend survey.

A sweet gum which Stonecipher concluded was both the "Sweet Gum marked JA" called to bear south 13½₀ varas from the southeast corner of the Jacob Townsend survey and the "gum" called to bear south 7 degrees east 12⁹⁄₁₁ varas from the northeast corner of the John Allen league was found by him 13½₀ varas south of the iron stake he used as the respective southeast and northeast corners of those surveys. According to his description, the tree was 30 inches in diameter, was marked with an X on its east side, bore evidence of a very old X on its north side, and was marked with the letters JA on its west side. Pictures of the tree were introduced in evidence, and they corroborated this description in large part.

In surveying the Harvey Vanway survey, the lines of which he was able to follow on the ground, Stonecipher found that the northwest corner of the survey was 17 varas south of the south line of the Morgan league; that the southwest corner of the survey was a similar distance south of the north line of the Allen league; and that none of the survey's lines were run on true north-south and east-west courses. They were each 1 deg. 30 min. off true course. When run toward the west, the north and south lines ran on courses of south 88 deg. 30 min. west; and when run toward the north, the east and west lines ran on courses of north 1 deg. 30 min. west. The variation of the east line of the survey from a true north-south course had the effect of moving the southeast corner 26.2 feet farther east than it would have fallen had the line been run due south from the northeast corner.

Additional of Stonecipher's findings were developed on cross examination:

He found a marked corner (markings quite old) 178 varas west of the river on the north line of the Allen league. It corresponded, according to his testimony, to a corner of a subdivision of the league, but

did not correspond to the league's northeast corner.

He found no evidence of corners or of a marked line where the west line of the Jacob Townsend survey should have been if laid in from the survey's northeast corner according to course and distance, but did find marked corners and a marked line 100 varas farther west. The corner monuments of this marked line, according to his testimony, were not those called for at the northwest and southwest corners of the Townsend survey, and the line extended on south into the Allen league.

He found the existing Newton road to be 200 varas south of where he placed the northeast corner of the Guthrie survey, and 130 varas east of where he placed the southeast corner of that survey. Since the field notes of the William G. Wright survey (surveyed in 1877) called for the survey's west line to begin at the northeast corner of the Guthrie survey (surveyed in 1856) and to reach the north end of a causeway in the Newton road at a distance of 100 varas south, and for the survey's south line to reach the west side of the Newton road at a distance of 245 varas east of the southeast corner of the Guthrie survey, he ran an experimental line so that it would reach the north side of the Newton road, as presently situated, 100 varas south of the south line of the Morgan league. The experimental line, it developed, was 138 varas west of where he actually placed the Guthrie east line. The west side of the Newton road was 240 varas east of the point where the experimental line intersected the north line of the Allen league. He found no evidence, according to his testimony, of a marked line in the vicinity of the experimental line and found no causeway in the Newton road. He did not know whether or not the Newton road was still in the same position it was in when the Wright survey was surveyed. He found that its position had been changed north of the Guthrie survey, but found no evidence that it had been changed where it crossed the Guthrie and Wright surveys.

On the north line of the Guthrie survey, 177 varas west of where he placed the survey's northeast corner, he found a large Magnolia tree—a Magnolia was called for at the Guthrie northeast corner—that was marked with an X that had no hack marks either above or below it. The tree stood near and on the west side of the Newton road. The mark on the tree, according to Stonecipher's testimony, was not a conventional corner marking, but was the kind of mark that is customarily made by surveyors at roads and trails. He found no evidence of a line running south from the tree.

At a distance of 430 varas west of the corner he adopted as the northeast corner of the Suddeth survey, and 811 varas west of the corner he adopted as the northwest corner of the Guthrie survey, he found a large Magnolia tree—no such tree was mentioned in the Suddeth field notes—that bore the very old markings of a corner witness-tree. He said he had heard from some source which he did not recall that this Magnolia had at times been considered to be the northeast corner of the Suddeth survey, but that his survey convinced him it was a corner of a subdivision of that survey.

The appellee introduced evidence which tended to show that neither the sweet gum tree relied on by Stonecipher as an original witness-tree called for at the southeast corner of the Jacob Townsend survey (the corner at which Stonecipher assumed to begin his survey), nor the 12-inch white oak relied on by him as an original witness-tree called for at the northeast corner of the David Suddeth survey was of sufficient age or size to have been the original witness-tree called for at either of those corners. A forester, Ray Gibson, called as an expert witness by the plaintiff, expressed the opinion, based on his own observation and on tests he conducted, that the sweet gum was not more than from 70 to 90 years of age. He had not seen the white oak but testified that when a tree stops growing it dies. He expressed the opinion that, even though stunted, both the white oak and the sweet gum would have grown appreciably

during the course of the many years since the Suddeth and Townsend surveys were surveyed. He also testified that he was unable to find any evidence of the letters JA on the sweet gum, and that the only X he found on it was on the southeast side of the tree, toward the river.

Stonecipher had expressed the opinion, based on observation alone, that the trees were trees that had either attained their full growth, or else were trees whose growth had been arrested because of unfavorable environment, and that both the trees and their markings were old enough to have been those originally called for. He admitted on cross-examination that any estimate he might make in terms of years as to the age of ancient hack marks could well be in error by as much as twenty-five years.

Appellee, Powell Lumber Company, also introduced the testimony of two witnesses, L. T. Heard and Jack Turner, to show that since 1941 the land in controversy or at least a part of it on the south end had been enclosed with other of the company's land by a fence on three sides (the west, south, and east) and by a drainage ditch or canal on the north, and that during all the time it had been so enclosed, L. T. Heard, as the company's tenant, had occupied, cultivated and used the land as land claimed by the company. The fence to the west stood on the Joseph Robinson survey, the south fence stood along the north edge of a road that ran along the Allen north line, and the fence to the east stood somewhere in the Suddeth survey. As best we can deduce from the evidence, the canal or drainage ditch crossed the alleged vacancy somewhere near half way between its north and south boundaries.

The witness Jack Turner was also questioned about the general reputation in the community as to whether or not the Vanway and Suddeth surveys were adjoining surveys. The extent of his testimony in this regard was that Henry Teal, who owned land in the northeast corner of the Suddeth survey, and Ben Reese, a former employee of Powell Lumber Company who had died some four years previously, had told him that the Harvey Vanway survey and the David S. Suddeth survey adjoined each other, and that he had always just assumed they did. The nature and source of Reese and Teal's information on the subject were not disclosed.

Of the several cases cited by counsel for appellee in support of their contentions that, because he called for the Vanway survey to adjoin the Suddeth survey, the surveyor who originally surveyed the Vanway survey must be presumed to have located and to have gone to the Suddeth west line, and that appellants are under the burden of proving that the calls for adjoinder were made by mistake, the cases most nearly comparable on their facts to the case at bar are those of Freeman v. Mahoney, 57 Tex. 621, and Moore v. Stewart, Tex.Sup., 7 S.W. 771.

In the case of Freeman v. Mahoney the plaintiff brought suit in trespass to try title against the owner of the Chambers grant, seeking recovery of land that had been patented to the plaintiff as vacant land lying between the Chambers grant, on the south, and the Rice, Hobson and Morrow grants, on the north. Judgment was rendered in favor of the defendant, the owner of the Chambers grant. The Rice, Hobson and Morrow grants were all junior to the Chambers grant, and the north line of the Chambers grant was called for as the south line of each of them. The south lines of the junior grants could be located on the ground, but the north line of the Chambers grant could not. The distance from the south line of the Chambers grant to the south lines of the Rice, Hobson and Morrow grants having been found to exceed by about 240 varas the distance called for as the width of the Chambers grant, which was 5,000 varas, a patent issued for the supposed vacancy, and the suit followed. In affirming the judgment of the trial court, by which it was held that no vacancy existed between the Chambers grant and the Rice, Hobson and Morrow grants, the Supreme Court said, in part:

"When we take into consideration the fact that all these surveys were made many years ago, and that the surveyors who made them in all probability saw the country when the natural objects called for in the Chambers grant still existed, we are not authorized to believe that they made statements under their official oaths which they did not know to be true, upon proof of the simple fact that to make the upper line of the Chambers grant where it was so declared to be, the grant would be to a trifling extent wider than stated to be in the field notes.

"It rested with the plaintiffs in this cause to show that the call for the northern line of the Chambers grant as the southern boundary of the Rice grant was a mistake, and we are of the opinion that the court did not err in holding that this evidence was not sufficient to show such mistake.

\*    \*    \*    \*    \*    \*

"He who at this late day when lands have become valuable, and those who originally surveyed them have passed away, makes a location between grants which surveyors who originally surveyed them, more than thirty years ago, under their official oaths, declared to be contiguous, should come prepared with evidence which will clearly show that such declarations were made in mistake, and such testimony must consist of something more than one or both of the grants will be slightly in excess of the area called for, to make such declarations good."

A similar fact situation was involved in the case of Moore v. Stewart, supra, but it was the defendant instead of the plaintiff who was claiming a vacancy between two surveys, the Squires, which was senior, and the Burkett, which was junior. On a jury's verdict, judgment was rendered for the plaintiff. Error was assigned to the action of the trial court in instructing the jury that the burden was on the defendant to prove that the call for adjoinder contained in the field notes of the junior survey was a mistake. In affirming the judgment of the trial court, the Supreme Court said, in part:

"The charge of the court complained of in the first assignment of error is, in our opinion, correct, under the facts of the case. The burden was upon the party claiming the vacancy between the surveys calling for each other to show it. * * * There is an old line where the plaintiff claimed the Squires north line to be, accepted by the defendant as the south line of the Burkett, and supposed to have been run by Green in making the original survey of the Burkett. His act and declaration that this was the north boundary line of the Squires should be allowed to stand until the contrary is made to appear. It is the best and most satisfactory evidence of the locality of the line to be found in the record. * * * Thus we see that there is but little proof upon which to base the conclusion that the line there found is not the common line between the two surveys, and but little evidence to overcome the declaration of Green that the line was a common line. We find that there is not sufficient testimony to justify the supposition that there was error in the charge of the court that the burden of proof was upon the defendant to show that there was a vacancy between the two surveys. He was correct in telling the jury that the burden was on defendant to show there was a vacancy."

As tending generally to support appellee's theory in the case at bar, we also quote from Leone Plantation, Inc., v. Roach, 187 S.W.2d 674, 682, err. ref. w.m., the following: "There is no evidence in the record that the lines of the Morey were not actually run at the time that it was located; nor that Ketchel did not run the lines of the Hairston as certified by him. In the absence of such evidence it must be presumed that the surveyor actually surveyed all the lines called for. Since Ketchel, in describing the Hairston, called for the northwest corner of the Morey as the beginning point, it must be further assumed, we think, that he knew where that corner was situated. Maddox v. Turner, 79 Tex. 279, 15 S.W. 237."

Of these presumptions, however, Justice Jenkins, in State v. Dayton Lumber Co.,

235

Tex.Civ.App., 159 S.W. 391, 394, err. ref., had the following to say: (Note: On motion for rehearing case was disposed of on question of venue or jurisdiction.) "It has been frequently stated, and correctly so, that, in the absence of proof to the contrary, the presumption will be indulged that the surveyor actually ran and established all of the lines and corners of the survey as called for in his field notes. This upon the general proposition that officers are presumed to have done their duty; but we know from experience that this presumption does not always hold true, and especially so as to surveyors actually running the lines and establishing the corners as called for in their field notes. Bacon v. State, 2 Tex.Civ.App. [692] 708, 21 S.W. [149] 152. Such a presumption is a very proper one to be indulged in the absence of evidence to the contrary, but it is to be indulged in the absence of evidence and not against it. The evidence against such presumption need not be positive. In many cases the circumstances are so strong as to entirely overcome such presumption, and we think such is the case in reference to these surveys, basing our conclusion upon the facts above stated."

And in Garcia v. State, Tex.Civ.App., 274 S.W. 319, 321, the following is found: "Nor do the calls for these monuments and corners marked by them in junior surveys control. In some cases calls in junior surveys for corners of senior surveys may be admissible as circumstantial, but they are not controlling. In the instant case these junior surveys appear to have been made by other surveyors some 25 years or more after the Trimble survey of 1856. And it was not shown that such surveyors knew where Trimble had run his lines. The trial court found, and there is evidence to sustain his finding, that such calls in junior surveys were made under the mistaken belief of the surveyors that these monuments did in fact mark the corners of the Los Ojuelos grant. But it is well settled that the boundaries of a senior survey cannot be extended or varied to satisfy the calls of a junior survey."

The field notes of junior surveys, made 30 years, and even as recently as 20 years, after senior surveys had been located, by surveyors who were not shown to have had any knowledge of the lines of the senior surveys, have been held to be inadmissible as evidence of the location of the lines of the senior surveys. Goodson v. Fitzgerald, 40 Tex.Civ.App. 619, 90 S.W. 898, 901; State v. Dayton Lumber Co., Tex.Civ.App., 159 S.W. 391, err. ref.

As further bearing upon the weight to be given the adjoinder calls in the junior survey, we again quote from State v. Dayton Lumber Co., supra: "But the field notes made by a subsequent surveyor, wherein he calls for the lines or corners of prior surveys, amount to no more than a declaration by him that he found such lines or corners at the places indicated by his calls. Such declarations are hearsay, and cannot be put in evidence, unless it be shown, not only that the surveyor was acting in his official capacity, but that he is dead at the time such evidence is offered. The party against whom such evidence is offered ought to have the privilege of cross-examining the witness, and ascertaining from him how he found and located such lines or corners. The testimony of such surveyor may furnish very strong evidence that the lines and corners of the senior surveys are located as called for in his field notes. On the other hand, a cross-examination may show that he located such lines and corners on a false theory, or upon mere supposition or hearsay, and that his evidence is entitled to no weight as to such location."

There seems to be also another presumption of which note should be taken, since it is equally as applicable to the Suddeth field notes as to the Vanway field notes: the presumption that while a surveyor is presumed to have gone to the corners and lines that his field notes call for, he is also presumed to have run the lines of his survey on the courses and for the distances described in his field notes. State v. Sullivan, 127 Tex. 525, 92 S.W.2d 228.

Then, too, the further presumption that bearing trees which can no longer be found are presumed to have been at the distances they were called for was indulged in the

case of Keystone Mills Co. v. Peach River Lumber Co., Tex.Civ.App., 96 S.W. 64, err. dis. w.j.

And because of the similarity of the fact situation there involved to the fact situation in the case at bar, as well as in the cases of Freeman v. Mahoney and of Moore v. Stewart (both of which cases we have hereinabove quoted from), we feel that we should quote from State v. Franks, Tex. Civ.App., 113 S.W.2d 589, 595, err. ref., the following: "Appellees attempted to establish their claimed north line of the House by following only one call of the House field notes and by surveying and locating at different times the southwest and southeast corners and south lines of the junior surveys which called for the north line of the House as their south boundary lines. Since these were all junior surveys, it was incumbent upon appellees to show some good reason for not following the footsteps of the original surveyor as determined by the original field notes of the House survey."

■ The presumption on which appellee relies has always been recognized as a rebuttable presumption, and a study of the several cases from which we have quoted and to which we have referred, as well as numerous others dealing with the same subject matter, and a comparison of the many so-called presumptions and counter-presumptions which have been indulged by our courts in boundary cases, leads us to the conclusion that, in final analysis, it has perhaps been more frequently indulged as a permissive presumption than as one required by law. In any event, we have been led to the conclusion that, as evidence of the location of the lines and corners of senior surveys, adjoinder calls in the field notes of junior surveys are entitled to only such weight as the facts of the particular case commend for them.

A circumstance to which the court obviously attached importance in the cases of Freeman v. Mahoney and Moore v. Stewart was that in each instance the surveyor who surveyed the junior survey had clearly intended to go to the line of the senior survey, as his field notes called to do,

and to leave no vacancy between the surveys; and the State had intended to grant to the lines of the senior surveys. An intent on the part of the surveyor of the Vanway survey to adjoin the Suddeth survey, as a matter of primary concern, is by no means so clear or certain in the case at bar.

He was locating either a pre-emption survey or a homestead donation, and in either case the area to be included was restricted by statute to not exceeding 160 acres. Actual occupancy by the pre-emptor or homesteader of at least a portion of the area to be surveyed was required. In such circumstances, the primary concern of the surveyor must have been to survey the area claimed by the occupant, to include the latter's improvements and not exceeding 160 acres of land. He had no occasion to be trying to use up all space between pre-existing surveys. He need not have been concerned with the Suddeth survey except to avoid conflicting with it; and regarding this contingency he may well have relied upon the claim and occupancy of the one for whom he was making the survey. In such circumstances, his calls for adjoinder with the Suddeth survey may well have been only incidental and upon the mere assumption that the Suddeth west line was where he called for it.

He was not shown to have had knowledge of where the west line and northwest and southwest corners of the Suddeth survey were located, and nothing contained in his field notes, other than his calls for them, indicate that he found or went to any of them. He called to commence his survey at the unmarked northwest corner of the Suddeth, and did not call for any witness-tree of the latter survey. Since approximately thirty years had elapsed since the Suddeth had been surveyed in 1871, if it may be assumed that the Vanway was surveyed at some time near the time it was patented in 1901, it would tax credulity to assume that the surveyor of the Vanway found or could have identified the post called for at the Suddeth northwest corner; nor did he make mention of the post in his field notes. And had he, in an effort to find the corner, surveyed from some recognized

corner or monument farther east, on the course on which he surveyed the north line of the Vanway survey (S. 88° 30′ W), both the northeast and northwest corners of the Vanway would have fallen considerably south of where he placed them. There is nothing, therefore, in the Vanway field notes themselves nor in the quality of work exhibited by the surveyor to corroborate his claim of having been at either of the Suddeth corners or on the Suddeth west line.

In the circumstances, we think of no good reason why the calls for adjoinder with the Suddeth survey should be entitled to greater credence than the calls for adjoinder with the Jefferson Robinson survey, or why more should be presumed in their favor than in favor of the latter, both sets of calls having been made by the same surveyor, in the same instrument, without distinguishing characteristics; and yet the calls for adjoinder with the Robinson survey are admittedly erroneous. The Vanway and Robinson surveys are separated by a distance of several hundred varas, and the surveyor obviously did not survey the line and go to the corners for which he called of the latter survey. The presumption that he did his official duty and surveyed all lines for which he called is thus completely rebutted as regards the Robinson east line, and the character of his work is impeached to an extent that we question whether any presumption should or does arise in connection with his calls for adjoinder with the Suddeth survey. The letter of March 21, 1902, from the Commissioner of the General Land Office to E. T. Farr and the plat made in 1901 which were introduced in evidence by appellee do not, in our opinion, give added reason for accepting the Suddeth adjoinder calls. They indicate, instead, that there was in existence at some time an erroneous plat or map of the area which probably accounted for the calls for adjoinder with the Robinson survey, and may have as well accounted for the calls to adjoin the Suddeth survey.

█ But aside from the matters already mentioned, the question of whether or not the presumpton under discussion may be in-

dulged at all in the circumstances of the present case, and if so the probative weight to be given it, must be considered in the light of another well established rule of law for the construction of grants and the establishment of boundaries: the rule that where a survey cannot be located on the ground from any of the natural or artificial objects called for in its field notes, the proper way to locate it is by its course and distance calls from the nearest recognized and established corner or object with which its field notes connect it. Thompson v. Langdon, 87 Tex. 254, 28 S.W. 931; Freeman v. Mahoney, 57 Tex. 621; Upshur County v. Lewright, Tex.Civ.App., 101 S.W. 1013, err. dis.; Guill v. O'Bryan, Tex.Civ.App., 121 S.W. 593; Taylor v. Higgins Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288, err. dis.; Petty v. Paggi Bros. Oil Co., Tex.Com.App., 254 S.W. 565; Kirby Lbr. Co. v. Adams, Tex.Com.App., 93 S.W.2d 382.

Representative of the expressions to be found in the cited cases are the following, quoted from the cases indicated:

Guill v. O'Bryan [121 S.W. 596]: "Where no marked trees are on the ground identified by the evidence as those of the grant, as in this case, the true boundary must be ascertained by course and distance given in the patent. Luckett v. Scruggs, 73 Tex. 519, 11 S.W. 529."

Upshur County v. Lewright: "Where the field notes of a survey are complete in themselves, and contain no inconsistent calls, and can be identified by course and distance from the beginning corner, it is not permissible to look to the field notes of another survey in order to create inconsistency in the calls of the survey which are complete in themselves. Thompson v. Langdon, 87 Tex. 254, 28 S.W. 931. As the bearing trees called for in the field notes of the Upshur County survey cannot be found upon the ground, we are of opinion, as a matter of law, that that survey must be located by running the course and distance called for in its field notes, beginning the survey 5,000 varas south of the northwest corner of the Travis county survey."

Kirby Lumber Co. v. Adams [93 S.W.2d 385]: "We do call attention, however, to the rule of law to the effect that where the natural and artificial objects of the grant cannot be identified upon the ground, the proper method of locating the lines and corners will be by course and distance from the nearest recognized and established corner or artificial object with which the field notes are connected. Petty v. Paggi Bros. Oil Co., Tex.Com.App., 254 S.W. 565."

Freeman v. Mahoney: "Course and distance, in the absence of some more certain means of establishing boundary, are resorted to for the purpose of establishing where the line was originally established, and is evidence of that fact which ought to prevail in the absence of other evidence, in a case tending with reasonable certainty to establish a different result."

The field notes of the Suddeth survey are complete within themselves, contain no inconsistent calls, and do not, of course, call for the junior, Vanway survey. Furthermore, resolving the disputed fact issues in favor of appellee, and construing the evidence most favorably to the trial court's judgment, we must assume that the trial court found that none of the lines or corners of the survey can be identified on the ground by any of the objects called for in the survey's field notes. The fact situation presented, therefore, is in all respects a proper one for application of the rule of construction now under discussion. Furthermore, the northwest corner of the F. Y. C. Guthrie survey, if that corner is sufficiently identified by the evidence as an established corner, is the proper corner from which to construct the survey, it being not only the nearest corner with which the Suddeth survey's field notes connect it, but also the corner from which the survey was originally constructed.

In opposition to this manner of constructing the survey, and as its underlying theory of why no vacancy should be found to exist, it is apparently the contention of appellee that, since the northeast corner of the Allen league could not be definitely identified by its original monuments, and a marked corner was found 178 varas west of the river, and since other objects about which the witness Stonecipher testified on cross-examination were found at varying distances west of where he placed some of the lines to which appellee would apparently give the objects application, the trial court was at liberty to adopt the corner 178 varas west of the river as the Allen northeast corner and to be governed by other of the objects so as to extend all of the surveys west and leave no vacancy; or else that such uncertainty was thereby created about the locations of the various corners and lines that none of them could be said to have been established by a preponderance of the evidence, and it could not be said from a preponderance of the evidence that the surveys did not extend west so as to leave no vacancy.

■ This argument, however, fails to take into account the fact that the northeast corner of the Allen league was called to be "on the west bank of the Sabine River." One set of field notes for the survey expressly so provided, and the other set, which obviously called for the same corner, did so by necessary implication. The call in the latter set of field notes to go from the northeast corner of the survey "down the river" to the place of beginning, which was "on the waters" of the Sabine River, was the equivalent of calling for the meanders of the river, and would require that the northeast corner of the survey be also on the river, Stover v. Gilbert, Tex.Com.App., 112 Tex. 429, 247 S.W. 841; 7 Tex.Jur. 128. "The words 'west bank', as applied to a river, means the land adjacent to the water on the west side thereof." Graham v. Knight, Tex.Civ.App., 240 S.W. 981, 983. In these circumstances, and in the absence of evidence clearly establishing that the corner which was situated 178 varas west of the river was in fact the Allen northeast corner, the trial court, in our opinion, would not have been justified in so treating it, and in disregarding what was clearly an established and recognized corner situated within 13 varas of the river bank, even though the latter corner could not be identified by original monuments.

The argument also disregards the fact that there was no evidence, aside from the mere existence of the objects themselves, tending to show that any of the objects now under discussion corresponded to any of the original objects called for in the field notes of the various surveys, while there was affirmative evidence to show that they did not. Moreover, there was affirmative evidence tending to show that most of the objects could be plausibly accounted for on some basis other than that they were monuments of the surveys with which we are concerned. The adoption by the trial court of any of the objects or lines as originals called for in the field notes of the various surveys would have had to be based on mere speculation rather than on evidence having probative force.

Counsel for appellee also advance the theory that the evidence adduced by appellee, taken in conjunction with the physical aspects of the trees themselves, showed the witness Stonecipher to be so palpably in error about the ages of the sweet gum tree and the white oak tree, and in his opinion that they were original witness-trees called for at the northeast corners of the Allen league and the Suddeth survey, that the trial court was at liberty to disbelieve and disregard all of the witness' testimony. In essence, their contention appears to be that the trial court was warranted in finding, and should therefore be presumed to have found, that the witness did not bona fide entertain the opinions which he expressed, but swore falsely regarding them, and was therefore unworthy of belief in any of his testimony.

We do not think the evidence warranted any such conclusion by the trial court, and since the testimony of the witness with reference to the objects he found on the ground, the measurements he made, etc., was uncontroverted, we are of the opinion that the rule announced in the case of Texas & N. O. R. R. Co. v. Burden, 146 Tex. 109, 203 S.W.2d 522, 530, with reference to the province of the jury has equal application to the trial court in this instance; that is: "It is the province of the jury to decide the issues which are raised by conflicting evidence, but where there is evidence upon an issue and there is no evidence to the contrary, then the jury has not the right to disregard the undisputed evidence and decide such issue in accordance with their wishes."

We are of the opinion that the true location on the ground of the northwest corner of the F. Y. C. Guthrie survey (the corner from which the Suddeth survey was constructed) was established by the evidence as a matter of law. The corner, from which a marked line ran south to the Allen north line, was not only identified by a corner witness-tree that corresponded in kind and on course and distance to one of the witness-trees called for at that corner, but it was also found to be the correct course and distance from both the Allen northeast corner and the Townsend southwest corner, or from the places or approximate places where, under their calls, those corners should have stood. These facts were uncontroverted, and no effort was made to explain them away. Taken together, they constitute a combination of circumstances which is too strong, in our opinion, to be accounted for by mere coincidence, and, to our minds, they must be accepted as establishing the corner.

It follows from what we have already said that it is or would be proper, under the record as made, to construct the Suddeth survey by its course and distance calls from this established corner. We are further of the opinion that the survey must be so constructed if it has no established and recognized east line and if effect is not given to the objects on the ground which the representatives of the State have heretofore recognized as belonging to and identifying the survey.

The record does not disclose what location the appellee claims for the Suddeth east line, nor whether there is an established line which is recognized by the owners of the respective surveys as dividing the Suddeth survey and the survey lying east of it; nor does it in anywise negative the fact that appellee claims for the line the

same location as that at which the witness Stonecipher placed it. Our interest in the Suddeth east line, however, is only incidental; its location is not before us for determination; and nothing that is contained in this opinion is intended as an adjudication of its location or as an attempt to adjudicate its location. For the purposes of this opinion, however, and in adjudicating the location of the west line of the survey, we shall treat of the survey as a whole, and even of the east line, in such manner as we think proper on the record.

With the explanation which we have just made, we disregard the possibility or probability that the Suddeth survey has an established and recognized east line, and hold that, on the record before us, the west line of the survey must be located by constructing the survey by its course and distance calls from the northwest corner of the F. Y. C. Guthrie survey, unless effect is given to the objects on the ground which the representatives of the State have recognized as belonging to and identifying said west line.

While this result follows naturally from an application of the rule for the construction of grants that we have just been discussing, we do not necessarily predicate our holding upon the theory, nor do we wish to be understood as holding, that this rule is in all instances paramount to the presumptions that ordinarily arise in connection with adjoinder-calls, nor so incompatible with them that the latter cannot be given consideration and their due weight. Aside from the rule, we have concluded that when the Suddeth west line is laid in by course and distance, the distance which intervenes between it and the Vanway east line, when considered in connection with the other matters we have already mentioned, is so great as to lead inescapably to the conclusion that the adjoinder-calls in the Vanway field notes were made through mistake and upon an erroneous assumption as to the location of the Suddeth west line.

When laid in by course and distance, the Suddeth west line falls 10 varas east of where the representatives of the State have placed it, making the distance from the

Suddeth northwest corner to the Vanway northeast corner 409.2 varas. We think it unreasonable to suppose that the surveyor of the Suddeth made so great an error in measuring what was called to be a line only 904 varas in length.

We feel that it was a situation such as this that Justice Stayton had in mind when, in Freeman v. Mahoney, supra, he said: "An excess might be so large as in itself to show that the call for another grant was a mistake, and in such case course and distance would control."

We furthermore feel that, all circumstances considered, what the original surveyor of the Suddeth surveyor himself said in his field notes with reference to where he went, what he did, and where he located the west line of the survey is, as a matter of law, entitled to prevail over what the surveyor of the Vanway survey said on the subject some twenty-five or thirty years later. Constructed in accordance with its field notes, the survey has its complement of acreage, and all surveys to the east of it have their complements of acreage, without violence to the field notes of any of them.

The evidence introduced by appellee for the purpose of showing that the Vanway and Suddeth surveys were reputed in the community to adjoin each other shed no light on the matter in issue, and requires no discussion. It neither qualified as reputation evidence, nor pertained to the location of the Suddeth west line as originally run and marked. See 7 Tex.Jur. 244, Boundaries, Sec. 83.

█ It follows from what we have said that we are of the opinion the trial court erred in decreeing and adjudging the land in controversy to be a part of the David S. Suddeth survey, and in adjudging it to be owned as set out in the judgment. The judgment of the trial court is accordingly in all things reversed, and judgment is here rendered that the land in controversy, a description of which is to be found in the record, is vacant and unsurveyed school land which is owned by the State of Texas,

subject to such rights as the various parties to the suit may have under applicable law to purchase or lease the same.

Due to the fact that no vacancy was found to exist, the question of whether or not appellee and those claiming under it are good faith claimants of the land in controversy within the contemplation of law, and entitled to preferred rights as such, was not passed upon in the trial court. The cause is in part remanded, therefore, for trial of this issue.