HEIRS AND UNKNOWN HEIRS OF Reuben BARROW, Jr., et al., Appellants,

v.

CHAMPION PAPER & FIBRE COMPANY et al., Appellees.

No. 6027.

Court of Civil Appeals of Texas.

Beaumont.

July 16, 1959.

Rehearing Denied Sept. 16, 1959.

Fountain, Cox, Gaines & Fox, Houston, Bradford Pickett, Liberty, John L. Compton, Houston, P. E. Johnson, Liberty, Fred A. White, Port Arthur, Cain & Chessher, Liberty, for appellants.

Vinson, Elkins, Weems & Searls, Houston, Hightower & Wheat, Liberty, Williams, Lee & Lee, Foreman & Hendrix, Houston, for appellees.

McNEILL, Justice.

The suit involves the title to a tract of 565.8 acres of land in the N. two-thirds of the Reuben Barrow one-third league in Liberty County. The survey was patented

by the State to Reuben Barrow, Jr., in the year 1849.

The parties involved as plaintiffs are Champion Paper & Fibre Company, and J. H. Kurth, Jr., and S. W. Henderson, sole surviving trustees for the former stockholders of Newton County Lumber Company, a dissolved corporation. The petition named as defendants the heirs and unknown heirs of Reuben Barrow, Jr., deceased, and the heirs and unknown heirs of many other individuals, the list covering pp. 2–35 of the transcript, all of whom were cited by publication, as well as a list of persons claiming under certain instruments, and an additional list of some eight pages of defendants described as non-residents of the State. Additionally, West Virginia-Texas Oil Company, Gulf Oil Corporation, Sohio Petroleum Company, and individuals of Liberty, Harris and of several other Texas counties were made defendants. In addition to alleging the statutory title, plaintiffs claimed limitation title under the statutes of 5 and 10 years, Vernon's Ann. Civ.St. arts. 5509, 5510. For those of the defendants cited by publication failing to answer, the court appointed Hon. R. E. Biggs of Liberty and Hon. Joyce Cox of Houston to represent them and have filed answer for them. At the conclusion of the trial to a jury the trial court rendered judgment upon the verdict in favor of plaintiffs except as to a 1/16th perpetual royalty decreed in favor of the defendants Hamilton, et al., and except as to certain leasehold interests decreed to Sohio Petroleum Corp.

The appellants are the Reuben Barrow, Jr., heirs and a group of defendants hereinafter designated as the subdivision defendants, and the plaintiffs above described are the appellees. However, since the briefs of the parties and the other records in the case treat appellees as plaintiffs, the heirs and unknown heirs of Reuben Barrow, Jr., deceased, as the Barrow heirs and the other appellants, subdivision defendants, as S–D defendants, these parties will be so referred to hereinafter. There are yet another small group of defendants, but since they have not appealed they are not involved here and we will not further describe them.

The case involves two principal questions. First, the proper construction of the deed made by Reuben Barrow, Jr., on January 14, 1864, party of the first part, to R. O. W. McManus and J. P. Viguerie as parties of the second part, and is as follows:

"* * * doth grant and convey to the said parties of the second part their heirs and assigns forever all that certain piece or parcel of land lying and being in the County of Liberty the same being a part of my Headright Certificate No. 209, issued by the Board of Land Commissioners of Liberty County on the first day of March 1838.

"Beginning at a Water Oak mkd AV on the East Bank of the East San Jacinto River the same being the Northwest corner of Ann Holtzhousen's Survey from which an Oak mkd X (3 hacks above and 3 below) bears S. 66° E. dist. 10 varas a Water Oak blazed bears N. 11° E. 10⅔10 varas; Thence up said River with its meanderings to the second corner, a satke from which a Cypress mkd 4 bars S. 69° E. 9 vars and a Sassfras mkd X bears N. 80° E. 3⅝10 varas;

"Thence East Fiftynine hundred and fifty varas to a stake from which a Sweet Gum mkd X bears N.E. 1¼10 varas, a Sweet Gum mkd 4 bears N. 43 W. 5⅝10 varas;

"Thence South Fourteen Hundred and Fortyfour Varas to a stake on said Ann Holtzhousen's Northline from which a Sweet Gum mkd 4 bears N. 25° E. 4 varas, a Sweet Gum mkd X bears S. 59 W. 7⅝10 varas;

"Thence West with said line Fiftyfour Hundred and Thirtyfour varas to the place of beginning, containing one third of a league of land. Nine Hundred and Eightysix acres of the said

third of a League above described is hereby conveyed by the party of the first part unto the parties of the second part together with all and singular, the tenements, hereditaments and appurtenances and all the estate, title and interest of the said party of the first part therein and the said party of the first part doth hereby covenant and agree with the said parties of the second part that at the time of the delivery hereof the said party of the first part is the lawful owner of the premises above granted and seized thereof in fee simple absolute and that he will warrant and defend the same in the quiet and peaceable possession of the parties of the second part, their heirs and assigns forever."

Both plaintiffs and S–D defendants rely upon and claim under this deed. If this deed effectively conveys the north two-thirds of the one-third league or conveys all of the estate, title and interest of Reuben Barrow, Jr., in said one-third league, the defendant Barrow heirs have no standing in this case. Their contention therefore is that the deed is void and ineffective to describe any land.

The other principal question hinges on the "locatability" of a certain subdivision of a tract of 750 acres in the North two-thirds of the said Reuben Barrow Survey known as the West Virginia-Texas Oil Company Subdivision which was recorded in Vol. 54, p. 434, Deed Records of Liberty County in connection with a certain contract of agency and sale between one J. C. Vlerebome and George W. Ginther hereinafter further referred to. In addition to the principal map there were maps labeled A, B, and C, each of which re-subdivided portions of the 750 acres subdivided. The subdivision defendants are those claiming title under deeds given upon the basis of the subdivision recorded in Vol. 54, p. 434 of said deed records.

Reverting to the first question, it is argued by the plaintiffs, joined by the S–D defendants, that the above deed from Reuben Barrow, Jr., to McManus and Viguere was a sufficient conveyance to the persons who were predecessors in interest of plaintiffs and S–D defendants of all the estate, title and interest Barrow had in and to said one-third league. The Barrow heirs as above mentioned contend that said deed is invalid because it fails to describe and convey any property. The Barrow heirs rely strongly upon Wilson v. Fisher, 144 Tex. 53, 56–57, 188 S.W.2d 150, 152, which lays down the rule: "* * * the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty," and insist that measured by this language said deed from Barrow is ineffective, that while the deed attempts to convey 986 acres the description thereof is void. However, this case recognizes the rule that where the instrument uses words such as my "headright" or other particularly named tract that parol evidence may be used to explain and identify it.

 Bearing on the question before us, we quote what was said by Gaines, C. J., in Curdy v. Stafford, 88 Tex. 120, 30 S.W. 551, 552: "The language of a deed is the language of the grantor, and, if there be a doubt as to its construction, it should be resolved against him. Again, if an instrument admit of two constructions, one of which would make it valid, and the other of which would make it void, the former must prevail. An instrument which purports to convey 'a part' of a certain designated tract of land, but which does not describe that part, is void for uncertainty. But one which purports to convey that part of a certain tract which is owned and claimed by the grantor is not void upon its face, for it may be shown by extrinsic evidence what particular part the grantor so owned and claimed. So a description of the thing conveyed as the interest had and claimed by the grantor in a part of certain land is capable of being made certain because it points out the part conveyed as the part in which the interest is owned and

claimed." This language establishes the rules of construction which control the decision to be made here. The Barrow deed contains in the following quotation the "key" to identify the 986 acres of which "party of the first part is the lawful owner * * * seized thereof in fee simple absolute * * *." In making this key effective plaintiffs offered in evidence the following deed from Barrow to one Watson Hardin:

"Know All Men By These Presents: That whereas, I, Reuben Barrow, Jr., of said State & County did heretofore by my own certain deed of conveyance convey unto Watson Hardin of the County of Liberty, State aforesaid the hereinafter described property for a valuable good and sufficient consideration to me by him paid and whereas it has been made known to me that the said conveyance has been lost and destroyed by fire together with the record thereof in the Court House of said Liberty county & and that the same cannot be replaced, except, by suit to substitute which would entail considerable expense & trouble & therefore, I, the said Reuben Barrow Jr., in consideration of the premises & the sum of one dollar to me paid have & by these presents do make this deed in lieu of & and in place & stead of the said lost & destroyed deed of conveyance, and do by these presents convey unto the said Watson Hardin & such of his heirs or assigns as may be entitled thereto by law, with the same effect & force of the said lost & destroyed deed, the following & above referred to property, to-wit:

"492 acres of land being the most Southern portion of one third of a league of land situated on East San Jacinto River for which a patent number 999 in Vol. 6 of the 1st. class issued to (me) Reuben Barrow, Jr., on the 6th day of January 1849.

"Beginning at the S.W. corner of said third of a league,

"Thence up East San Jacinto River with its meanders to a point hereon from which a line running East to the Eastern line;

"Thence to the South East corner of said third of a league to the beginning so as to embrace four hundred and ninety two acres;

"The same being the locating interest, to which said Hardin was entitled out of said one third of a league of land.

"To have and to hold, all & singular the above described 492 acres together with all the rights, members & appurtenances to the same belonging or in anywise incident or appertaining unto the said Watson Hardin his heirs that may be entitled to the same by law, & with the same force or effect of the said lost deed made direct to said Hardin &c.

"And this deed is intended to operate and have the same effect as the said lost deed & of which this is given in the place and Stead in lieu of.

"Given under my hand this the 11 day of February A.D. 1882

"Reuben Barrow."

This deed recites that it is the "locating interest" of the grantee and was made to take the place of a former deed destroyed when the Liberty County Courthouse burned. It appears to have been customary in the early days of our State for the owner of a headright certificate to give one who locates and surveys the land one-third thereof; and when the land is so located and surveyed the locator becomes the equitable owner with the other party of such land. Stieler v. Hooper, 66 Tex. 353, 1 S.W. 317; Doss v. Slaughter, 53 Tex. 235. Having proved up the Hardin deed making Barrow's interest thereby definite at the time he executed the deed to McManus, et al., the following language from Pickett v. Bishop, 148 Tex. 207, 223 S.W.2d 222, at page 224, is appropriate:

"The stated ownership of the property is in itself a matter of description which leads to the certain identification of the property and brings the de-

scription within the terms of the rule that 'the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty.' Wilson v. Fisher, [supra]."

■ To the same effect is Skinner v. Noland, 154 Tex. 615, 281 S.W.2d 332. And having the "key" to the 986 acres as that owned "by him in fee simple absolute" the later deed from Barrow to Hardin, which was given in lieu of a prior one that had been lost, shows clearly that the 986 acres conveyed were the North two-thirds of the one-third league. The record indicates that Reuben Barrow rendered his tract in the Barrow one-third league for taxes each year through 1863 but never thereafter. He never thereafter asserted claim to any part of this league, and this conduct indicates he intended by the deed to McManus, et al. to convey all his title in the one-third league. Miller v. Hodges, Tex.Com.App., 260 S.W. 168.

■■ We further hold that by the language "And all the estate, title and interest of the said party of the first part therein" conveyed the entire title Reuben Barrow, Jr., then owned in the one-third league to the grantees. By examination of the deed as first set out herein it will be seen that the immediate antecedent of the word "therein" as just quoted is "said third of a league." Curdy v. Stafford, supra.

Going now to the second question mentioned above, in order to understand the issue, it is proper first to state that J. C. Vlerebome became the owner of a tract of 854 acres in the North two-thirds of said one-third league. This tract we describe as:

"Beginning at the N.E. corner of the Barrow; Thence South on the East boundary line 962⅔rds varas, same being the Northeast corner of the South one-third of said Survey; Thence West 4,171 varas; Thence North 268⅔rds varas; Thence West to the East San Jacinto River; Thence North with said River to the Southwest corner of the Henry Scott 80 acres in the Northwest corner of the Barrow; Thence East in the South line of the Scott tract to its Southeast corner; Thence North in the East line of the Scott tract to the North boundary line of the Barrow Survey, same being the Northeast corner of the Scott tract; Thence East along the Barrow boundary line to the beginning."

This deed was made April 12, 1910. On November 23, 1914, Vlerebome made the following contract with George W. Ginther:

"J. C. Vlerebome and George W. Ginther — Contract Dated: Nov. 23, 1914 Filed: Nov. 23, 1915 Recorded: Vol. 54, pg. 434 Deed Record: Lib. Co. Tex.

"Entered into this 23rd day of November, 1914, by and between J. C. Vlerebome, of New Holland, Ohio, Party of the first part and George W. Ginther, of Hartford, West Virginia, but now engaged in business in Columbus, Ohio, party of the second part, Witnesseth—That the party of the first part is the owner of 854 acres of land (more or less) in the County of Liberty, State of Texas, and known and described as 'the north ⅔rds of the ⅓rd League of the Reuben Barrow Survey', which he is desirous of selling, and the party of the second part is desirous of taking over the exclusive rights to sell the said land for himself, and his assigns, Therefore it is contracted and agreed: That the party of the first part, for and in consideration of the sum of twenty dollars ($20.00) per acre, and the further consideration of the services of and expenses incurred by the

344

party of the second part in surveying and platting 750 acres of said tract of land, and the further consideration of 150 shares of the 1200 shares of stock to be issued by the proposed oil company, as hereinafter stated, does agree to sell, and convey said land by good and sufficient Warranty Deeds unto the said party of the second part his assigns, or to whomsoever he, the party of the second part or his assigns shall nominate, free of all incumbrances and including a release of all right of dower, and in tracts of such acreage as the said party of the second part shall direct each such conveyance to be made by the party of the first part on the day and date of the payments to him of the last installment of the sum equal to the said $20.00 per acre in each such said tracts 750 acres of the said tract have been platted in 'one' and 'five' acre tracts, as shown by the blue print hereunto attached, and the said party of the second part agrees to sell all of such tracts that can be sold at a price of Fifty dollars ($50.00) per acre, payable in such installments as will be provided in the contracts with the purchasers; *Forth* per cent of all collections made from said purchasers shall be paid to the said party of the first part, until he shall have been paid the said $20.00 per acre; Twenty per cent of all such said collections shall be deposited with a Bank or Trust Company as a trust fund for the development of oil and mineral by the proposed Stock Company to be organized for that purpose, as provided in the contracts with purchasers. Twenty per cent to be held by the said party of the second part and his assigns as a selling commission, and twenty per cent to he held by the party of the second part with which to pay all the expenses incurred in the business. If at the time all of the 750 acres shall have been sold as herein provided, there shall be remaining any balance of cash after all expenses shall have been paid, such said balance shall be equally divided between two parties to this contract.

After this said tract of land shall have been legally surveyed and its exact acreage established the party of the first part shall at any time upon the payment of $20.00 per acre make conveyance of all acreage in excess of the 750 acres now platted, to whomsoever the said party of the second part shall direct. The said party of the first part reserves all the timber rights on this said land for himself, and the same is not conveyed or contracted to be conveyed by this instrument. The party of the first part agrees to pay all the taxes for the year 1914 and all back taxes of whatever dates or years that may not at this time have been paid. And this paragraph is construed to mean all assessments for roads or any purpose whatever as well as the regular taxes. The said party of the first part agrees to pay all expenses incurred and which may be hereafter incurred in the matter of perfecting and clearing his title to said land. This contract for deeds in binding upon the heirs, executors, administrators and assigns of both parties hereto.

"Witness our hands and seals this 23rd day of November, 1914, at Columbus, Ohio.
"In Presence of: J. C. Vlerebome
 B. Baker Party of the first part,
 Robert E. Pfeiffer Geo. W. Ginther party
 of the second part.

"State of Ohio }
Franklin County }

"Personally appeared before me, a Notary Public, and for the County of Franklin, State of Ohio, J. C. Vlerebome, of New Holland, Ohio, and Geo. W. Ginther, of Hartford, West Virginia, and each of said parties acknowledged the signing of the foregoing contract, and a full understanding thereof.
(Seal)
 "Robert E. Pfeiffer
 Notary Public."

Attached to this contract is the following map:

MAP SHOWING SUBDIVISION
PARTS OF THE NORTH ½ OF THE REUBEN BARROW SURVEY
LIBERTY COUNTY, TEXAS

WEST VIRGINIA—TEXAS OIL COMPANY
HOUSTON, TEXAS

The above contract and map, along with the re-subdivisions A, B, and C thereof as above mentioned, constitute the backbone of the title asserted by S–D defendants. Strenuous objection was made to the introduction of said map by all of the parties plaintiff in the suit, contending that the map gave no key to its identity or location upon the ground, was so general and indefinite that it was completely ineffective and void. The trial court though, after mature consideration, allowed it to come in as evidence. This ruling is attacked by plaintiffs.

A summary may here be made of the arguments given by the parties for and against the admissibility of this subdivision map and agency contract. The reasons given by the S–D defendants for their admissibility are: (1) since the plat and contract were both properly recorded they were sufficient to put purchasers on notice of the S–D defendants' claim, since the contract stated, in effect, that an accurate survey would be made of the subdivision and a corrected plat would be filed; and this S–D defendants claim to have been done in 1917 as hereinafter mentioned; (2) since the plat gives the scale of 1 inch to each 800 feet and describes the area of the different blocks, lots and sections, and its North line being a double line which extends Westerly beyond the subdivision to the San Jacinto River, which river indicates the direction of the water flow, and since the record indicates no other marked line in the area on the ground than the North line of the one-third league, it is reasonable therefore to conclude that the North line of the subdivision so extending West indicates that the subdivision is laid out so that its North line would coincide with the North line of the one-third league and since the distance as scaled on the map of its East line is 900 varas long, and the distance between the North line of the one-third league and the South line of the North two-thirds thereof is 932⅗oths varas it indicates that the East line of the subdivision is coincident with the North portion of the

league's East line. It was shown in the testimony of the S–D defendants' surveyor, J. C. Boyles, later in the trial, that he scaled the North double line with a map from the East side of the river to the Northeast corner of the plat and it was 5,922 varas long. The actual length of the one-third league's North line is 5,950 varas. He stated that the length of the North and South lines of the subdivision were each 4,813⅗oths varas. He further stated that the distance from the Northwest corner of Block 1 to the river was 3,080 feet; and further that the width between the double lines on the subdivision scaled at 30 feet. He further stated that upon scaling the entire map for acreage, instead of containing 750 acres it contained 767⅗oths acres. Mr. H. O. Compton, also a surveyor for the S–D defendants, substantially supported Mr. Boyles' testimony, except that his scale of the north double line at the top of the plat was 5,929 varas. (3) The double lines on the map indicate clearly that they represent roads to make each lot on the map accessible.

(4) The S–D defendants urge or contend that where the north line crosses the river, abutments are reflected on this map to indicate a bridge. However, the testimony shows that the only bridge across this river in the area during the time involved was one near the southwest corner of the North two-thirds of the survey. Furthermore, the drawing of the river on this plat is not like the actual bed of the river as reflected by an actual survey thereof.

The arguments advanced against the admissibility of S–D defendants' Exhibit No. 8, being this plat, and the agency contract attached are as follows: (1) no monument or identifiable point can be found on said plat to anchor it to the ground; (2) the plat had many double lines and it is impossible with the scale furnished to ascertain the width of these lines. In addition, the calculation of the surveyors for the S–D defendants upon scaling this plat do not come out the same; there is a variance of

7 varas in the length of the north line as scaled by them. The re-subdivisions platted some of the land in lots 20 feet by 20 feet and under the scaling established in the record it would be absolutely impossible to identify any one of these small tracts. (3) Mr. Boyles, S–D defendants' surveyor, stated that the map could be shifted to various positions on the Vlerebome tract.

■■■ The establishment of this map or plat, which is referred to herein as S–D defendants' Exhibit 8, is prerequisite for them to sustain their title. Those who prepared it made no survey on the ground and it was therefore an office survey and must be construed as such. In such instance the cardinal object is to ascertain the intention of the engineer or surveyor, and this is found not upon vague conjecture, but by rational deductions from his work or report as compared with the then existing facts. Robinson v. Doss, 53 Tex. 496; Blackwell v. Coleman County, 94 Tex. 216, 59 S.W. 530; Phillips Petroleum Co. v. State, Tex.Civ.App., 63 S.W.2d 737. And as said by Devlin in his work on Real Estate, 3rd Ed., Vol. 2, p. 1955, "But a surveyor must have data, and cannot determine lines and fixed monuments according to his own ideas." There is nothing on the map to indicate its identity on the ground except the double lines along the north side of the subdivision which extend onto and across the East San Jacinto River. It is argued that these lines indicate the north boundary of the one-third league. While the north line of the league ends at the river, the double lines are shown extending across it, and the double lines, we think, were intended to indicate roads so that each lot on the subdivision would have ingress and egress. Much dependence for identification of the subdivision is put by S–D defendants in scaling the map as was done by their two surveyors. But to rely for location and identity of real property upon scaling a map involving a subdivision containing 750 acres upon which 1″ represents 800 feet is too uncertain and inaccurate by which to locate it. This will not do. While no direct decision in this state may be found on the point, the court in Blaffer v. State, Tex.Civ.App., 31 S.W.2d 172, at page 189, had this to say:

"The state contends that a scaling of the land office maps supports its theory of location, and that evidence concerning a block claimed to have been cut by Legg from the D gum at the south pond corner discredits it as a Henderson marking. The court's findings do not mention these subjects, but we will consider them briefly."

And after discussing the maps, the court concluded:

"We attach no significance whatever to a mere scaling of these maps, and the trial court evidently took the same view."

See Minneapolis & St. L. R. Co. v. Town of Britt, 105 Iowa 198, 74 N.W. 934. However, it should not be understood that scaling is necessarily condemned in every instance. But while a recognized tolerance exists in surveying as well as in other particular and professional work, yet a scale of 1 inch to 800 feet is upon such a contrast even the width of a line drawn upon the map must represent several feet. And although Exhibit 8 gives the acreage in lots, this would seem to be of little help as the ratio of the length of the adjacent lines thereof remain unknown. When one comes to examine the re-subdivisions A, B, and C which divided Sections A, B, and C respectively of defendants' Exhibit 8 consisting of 50 acres each into 20′ x 20′ lots and attempts to locate one of them upon the ground it is seen how hopeless and bewildering the task would be! The location of the many one-acre tracts would also be proportionately incorrect. Furthermore, one of S–D defendants' surveyors, Mr. Boyles, stated that based upon his scaling of Exhibit 8 it contained 767.3 acres instead of 750 acres. The record fails to show whether actual possession of any area in the plat was taken by a S–D defendant.

■ We have given very close and careful study to this question, for the instruments involved, the plat and agency contract and the deeds thereunder, represent an area or areas of considerable land, and the interests of claimants thereunder should not be struck down if there may be found reasonable certainty in the descriptions to support them. Gates v. Asher, 154 Tex. 538; 280 S.W.2d 247. But these instruments when considered alone fail to have that reasonable certainty.

■ S–D defendants argue that the agency contract provides for an actual survey on the ground of this 750 acre subdivision, that the actual acreage be established and that a corrected map thereof would be placed of record based upon such actual survey. We do not so construe this contract. Upon reading it, it is clear that the larger tract of 854 acres, the one out of which the 750 acre subdivision is to come, is indefinite in acreage for it is recited "854 acres more or less". In every reference to the subdivision the language "750 acres" is used; the plat itself calls for 750 acres except for the indicated roadways. So the exact acreage of the plat is already established. It is then provided: "After this said tract of land * * * (referring as we believe to the larger tract) * * * shall have been legally surveyed and its exact acreage established, the party of the first part shall at any time upon the payment of $20.00 per acre make conveyance of all acreage in excess of the 750 acres now platted, to whomsoever the said party of the second part shall direct." This clearly shows that what was to be surveyed is the larger tract—the acreage of the subdivision deducted and the exact acreage of the excess determined so that it might be sold at $20 per acre to Vlerebome. When the outline of the subdivision, as shown in Exhibit 8, is placed upon the field notes of the tract of 854 acres, more or less, above set out it will be seen that a considerable portion of the area in the southwest corner of the subdivision lies outside of the land owned by Vlerebome. Therefore, when a surveyor comes to make the actual survey he would no doubt discover this fact. Would this then require the surveyor, in carrying out that portion of the agency contract ascertaining the excess, to run out the lines of the subdivision and rework same much as was done in the Packard map? This it seems would be a matter resting solely with Vlerebome. The S–D defendants offered in evidence what they claim to have been a corrected plat or map of the subdivision, together with an accompanying certificate, both of which were in fact filed for record on December 13, 1917, in Vol. 72, p. 377 of the Deed Records of the County Clerk's office of Liberty County. This map was labeled "West Virginia-Texas-Oil Company's Subdivision in the North ⅔rds of the Reuben Barrow, Jr., ⅓ league in Liberty County, Texas." It appears to have been prepared by one Samuel E. Packard, a Civil Engineer of Houston. While there is some indication that field notes of this new subdivision were also filed with the county clerk in connection with this replat, it was stipulated by the parties that at the time of the trial there could not be found either in the Deed Records or County Surveyor's records of Liberty County any field notes to accompany said plat. However, in connection with the tender of the corrected map, the field book of surveyor, S. E. Packard, covering period from July 30, 1917, to December 27, 1917, which contained field notes of his survey were tendered, and the certificate to the corrected map, executed by the President of West Virginia-Texas Oil Company, acknowledged December 8, 1917, and also recorded in Vol. 72, p. 377, were offered in evidence by the S–D defendants but the records were excluded by the court. Among the objections urged against their reception in evidence was that they were hearsay, irrelevant and immaterial, the point evidently being that since Vlerebome had not himself executed the certificate to the map, that the execution and approval by

the West Virginia-Texas Oil Company was not the act of nor could it bind the original owner Vlerebome. This objection and the court's action in sustaining it poses a serious question. Upon a re-examination of the Vlerebome-Ginther contract it is seen that a corporation to drill for oil on the land was provided for and Vlerebome was to have been issued 1200 shares of stock therein. The original plat attached to this contract was labeled "West Virginia-Texas Oil Company" of Huntington, West Virginia and Houston, Texas. 150 acres of this 750 acre subdivision were soon thereafter conveyed to the corporation formed— West Virginia-Texas Oil Company. From time to time deeds to other lots over a period of several years were executed by Vlerebome and Ginther. In 1928 Vlerebome conveyed all of his then right, title and interest in the 854 acres lying in the North ⅔rds of the Barrow, which included the 750 acre subdivision to H. O. Compton and referred for his right and title "as evidenced by the records of Liberty County, Texas", among which was Vol. 72 deed records containing the corrected map made by Packard. However, the record indicates that the language in all of the deeds executed by Vlerebome and Ginther, after the Packard map was filed, continued to refer to the lots by the same references to the agency contract and to the original map of the West Virginia-Texas Oil Company of record as before the corrected plat was made and filed. And since the evidence showed that the most which said oil company ever owned in the subdivision was 150 acres, and since there does not appear to have been any authorization given the oil company by Vlerebome to execute the certificate to such corrected plat, the introduction of such corrected plat, certificate and field book of the surveyor would have been hearsay and irrelevant to the Vlerebome title and the trial court properly excluded it. Smith v. Sorelle, 126 Tex. 353, 87 S.W. 2d 703.

There are two Bills of Exception with reference to proffered testimony of the S–D

defendants' surveyors which were offered in connection with the explanation of S–D defendants' Exhibit 8 which should be noted. In Bill of Exception No. 8 the following questions and answers were developed:

"By Mr. Cox: Q. Mr. Compton, as an experienced surveyor, examining this plat, what would you take the lines from the river to the Northeast corner of the subdivision to represent? A. I'd take it to represent the north line of the Third League Survey.

"Q. As an experienced surveyor, what would you take east line on the Plat, Subdivision Defendants' Exhibit 8, to be? A. Well, after having scaled it, I take it to be the east line of the ⅓ League Survey.

"Q. What would you take the line running from the southeast corner of Block 10, on the Subdivision D-S, to the southwest corner of Block 20, on the Subdivision to be? A. Well, that particular line you're talking about has been in dispute always. It's been given three different widths, and it may have been that they didn't try to take in all of the north third.

"Q. But, basing your opinion, if you have any, if you can say, on the Plat alone and its reputation, what would you say it would be? A. I'd say that is the south line of 750 acre tract.

"Q. Now, is there any land that you know of called for in the records of your County, in the Record of Surveys, that this north line of the Plat could be other than the North line of the Reuben Barrow ⅓ League? A. No, sir, there is no record that shows any other line.

"Q. Do you know of any purpose the surveyor could have in showing the line between the river and the north-

west line of the Reuben Barrow Survey? A. I do not.

"Mr. Cox: We offer that, your Honor."

S–D defendants' Bill of Exception No. 6 reflects the following questions and answers:

"By Mr. Cox: Q. Mr. Boyles, in your opinion from studying this map, basing your answer on your experience and interpreting maps, and your knowledge and principles of map interpretation, what was the intent of the platter of the Defendants' Exhibit 8 with respect to the location on the ground of the north line of the Subdivision Plat? * * *

"The Court: Objection sustained.

"Q. (By Mr. Cox) Mr. Boyles, on the Bill, will you answer that? A. The intent, as I see it, was very definite to put the Subdivision out of the northeastern part of the Reuben Barrow League, having as its east line, the east line of the Barrow, and as its north line, the north line of the Barrow.

"Mr. Cox: We offer that, your Honor.

"The Court: I sustain the objection."

It should be borne in mind what was said above in connection with the cardinal object in construing an office survey—that being to ascertain the intention of the engineer or surveyor. As said in the case of Blackwell v. Coleman County, 94 Tex. 216, 59 S.W. 530, 531, the intent is the purpose deduced from what the platter did in making the plat and description of the land is meant, "and not one which has not found expression in his acts." We can find nothing which gives anchorage to the plat identified thereon except the East San Jacinto River but the distance of the west line of the subdivision from the river is not given and may be only deduced by the scale of 1″ to 800 feet. It is not thought that the double lines at the top of the map indicate the north boundary of the Barrow survey— at least primarily they indicate a road planned to be put across the river as access to the subdivision. Upon examining the map it will be seen that the double lines are intended as roads giving access to each lot. This we think is their fair interpretation. And it certainly would be logical since the 854 acre tract is in practically a rectangular shape, except for its westerly part, with its greater distance extending east and west, and since the map is in similar relative position, to assume that Vlerebome, the owner of the land, did not intend to set the 750 acres in the tract of 854 acres so that a small elongated area would be left around the subdivision. But can it be inferred from the factual data before us that it was more likely that the long double lines at the top and that on the east side also indicated portions of the north and east boundary of the Barrow survey more than that it was intended to put the subdivision in the south and west part of the 854 acres and thereby have roads available to sell off the balance of about 100 acres? It seems that the answer would be based upon pure conjecture. Jones v. Traders & General Ins. Co., 140 Tex. 599, 169 S.W.2d 160(5).

The evidence in the record as a matter of law clearly indicating that the 750 acre subdivision, as represented by S–D defendants' Exhibit 8, cannot be located upon the ground from the information furnished thereon and from the connected agency contract, other interesting points raised by these defendants become immaterial. The cause was ably tried in the court below and the briefs of the parties here have been of great assistance to us upon the study of the difficult questions involved.

The judgment of the trial court is affirmed.